### Don E. LESTER, Jr.,
### v.
### AETNA LIFE INSURANCE COMPANY.
### Civ. A. No. 9836.

United States District Court
W. D. Louisiana,
Shreveport Division.

Oct. 24, 1968.

Charles D. Egan, Cook, Clark, Egan, Yancey & King, Shreveport, La., for defendant.

---

Jack O. Brittain, Watson, Williams & Brittain, Natchitoches, La., for plaintiff.

### RULING ON THE MERITS

BEN C. DAWKINS, JR., Chief Judge.

Plaintiff, as named beneficiary of a life insurance policy issued by defendant, seeks recovery of the proceeds allegedly due him under the policy. Suit was originally filed in the Tenth Judicial District Court, Natchitoches Parish, Louisiana, but was timely removed to this Court. Our jurisdiction is based upon 28 U.S.C. § 1332, diversity of citizenship, and involves the requisite amount in controversy. The case has been submitted to us, without formal hearing, on joint stipulation of the parties. The facts are agreed upon as set forth below.

The policy of life insurance, having a face amount of $50,000, was issued May 1, 1952, to Don E. Lester, Sr., then a resident of Milwaukee, Wisconsin. Thus May 1 of each year was the anniversary date and premium due date.

Some of the pertinent provisions of the policy follow. Clause 4 provides:

"All premiums shall be paid in advance at the Home Office of the Company, or to its authorized agent, in exchange for a receipt signed by its Secretary or Assistant Secretary and countersigned by the agent. If any such premium is not paid when due, this policy shall cease, subject to the values and privileges hereinafter described; except that a grace of thirty-one days, during which the policy shall remain in full force, will be allowed for the payment of any premium after the first. * * *"

Clause 6 provided that the company would make loans on the security of the policy for an amount not in excess of the net loan value[1] of the policy. Specified per annum rate of interest on such loans was 5%.

Clause 8 contains an automatic loan provision which is available if due written request is made for its operation while there is no default in payment of premiums due. Essentially this clause provides that the amount of any premium due and not paid before the end of the 31-day grace period will automatically be loaned by the company and charged as an indebtedness secured by the policy. However, if the loan value is insufficient to cover the whole premium due, no automatic premium loan would be made under the provisions of Clause 8 but the provisions of Clause 7 would apply.

Clause 7 contains three options available to the insured in the event the automatic premium loan provision was insufficient to cover the total premium due. If none of the options provided in the policy were selected by the insured, the policy stipulated that insurance would be continued automatically as extended term insurance under Option (c). If there were any indebtedness against the policy, the extended term insurance would be for the sum insured less the indebtedness and for such a period as the cash value less the indebtedness would purchase.

When Lester, Sr., was issued the policy on May 1, 1952, he requested operation of the automatic loan provision in Clause 8. He timely paid the premiums for the policy years through 1961, making the total amount of premiums paid $22,520.

In 1957, Lester, Sr., with full knowledge of the insurer, moved his domicile from the State of Wisconsin to Natchitoches Parish, Louisiana, where he lived until his death on February 2nd, 1963. While in Louisiana, he made the following modifications and changes in this contract.

Two changes of beneficiaries were effected. The first was on December 22nd, 1958, when Lester, Sr., made the administrator of his estate the beneficiary.

---

1. Clause 6 defines "loan value" and "net loan value" respectively as follows:

"The loan value of the policy at any time shall be that amount which, with interest to the end of the current policy year or to the end of the current premium period if earlier, shall equal the cash value [i. e., cash surrender value] for the end of such policy year or period. The net loan value of the policy shall be the loan value of the policy less any unpaid premium for the current premium period."

The second was on October 27, 1961, when Lester, Sr., named Lester, Jr., plaintiff, as sole beneficiary of the policy.

August 2nd, 1961, the insured requested and obtained a policy loan of $12,398.-84 from defendant. The loan was secured by the cash surrender value of the policy.

May 1st, 1962, the yearly premium of $2,252.50 became due. In addition, Lester, Sr., owed $451.18 interest on the policy loan of $12,398.84, making a total indebtedness of $12,850.02. On that date, the cash value of the policy was $12,850.00. Thus the total indebtedness against the policy exceeded the cash surrender value by two cents.

A notice of premium payment due was issued by defendant to Lester, Sr., indicating that on the premium due date of May 1, 1962, he owed $2252.50, the annual premium, and $451.18, the interest due on the loan. There is no concrete evidence in the record establishing the date this notice was issued by the company or received by Lester, Sr.

Sometime between July 2d and July 5th Lester, Sr., was sent a notice dated July 2d, 1962, along with a letter dated July 3rd, 1962. The notice contained the following statement: "Although the automatic premium loan provision is in force, your policy does not have sufficient value to pay this premium by loan * *. Unfortunately your policy has lapsed without value other than your right to apply for reinstatement because indebtedness exceeds the cash value." The letter advised Lester, Sr., that he could complete and return, together with his remittance of $2,252.50 for the defaulted premium, an application for reinstatement. Lester, Sr., immediately returned to the company a check for $2,703.68, dated July 6, 1962, the application for reinstatement, and his letter from the company dated July 3rd, 1962. At the bottom of the letter, he made the following notation:

"Sorry, but Notice was misplaced. Please notify me if you reinstate.

D E L"

At that time there was more than sufficient money in his bank account to cover the check sent to the company.

In a letter dated August 8th, 1962, defendant advised Lester, Sr., that a physician's statement, including details of any cardiovascular findings, must be sent to the company before further consideration could be given to his application. When defendant received no response to this letter, they advised Lester, Sr., in a letter dated January 23rd, 1963, that, because he had not submitted the physician's statement, they were obliged to return his check for $2,703.68. February 2nd, 1963, Lester, Sr., died.

The contested issues of law are: (a) Whether the law of Wisconsin or Louisiana applies; (b) whether defendant gave Lester, Sr., adequate notice of the premium due on May 1, 1962, and of the inapplicability of the automatic loan provision at that time; (c) whether defendant is estopped from denying that the policy lapsed; and (d) whether defendant is estopped from denying reinstatement of the policy.

On the first issue, we hold firmly that Louisiana law applies.

■ Since Federal Courts must apply the conflicts of law rule of the forum in a diversity case, Klaxon Company v. Stentor Electric Mfg. Co., Inc., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), we direct our attention to the law of Louisiana on that subject.

The first paragraph of Article 10 of the Louisiana Civil Code provides: "The form and effect of public and private written instruments are governed by the laws and usages of the places where they are passed or executed." From this provision a general rule has evolved that the law of the place where the insurance policy is delivered ordinarily must govern. See Davis v. Insurance Company of North America, 268 F.Supp. 496 (E.D. La.1967), and cases cited therein. Defendant asks us rigidly to apply that rule and hold that the law of Wisconsin, where the policy was delivered, applies. We should ignore, says defendant, the ero-

sions and inroads made into traditional conflicts of law rules by recent decisions of a Louisiana appellate court. In these decisions there is recognition of the tremendous changes which the area of conflicts of law has undergone since 1965. Applying the "center of gravity" or "grouping of contacts," many courts throughout the United States have discarded or modified the traditional and once well established conflicts rules. The new and more rational approach avoids mechanical application of the law of the place of the making or performance of a contract; rather it places emphasis upon the laws of the State having the most significant quantitative *or* qualitative contacts directly concerning the matter in dispute. 16 Am.Jur.2d, Conflicts of Laws, § 42, at page 66.

The only Louisiana case which specifically has rested its holding on the modern conflicts approach is Universal C. I. T. Credit Corporation v. Hulett, 151 So.2d 705 (La.App. 3 Cir. 1963). There suit was brought for a deficiency judgment after sale of a repossessed automobile failed to bring enough to pay the balance due on the purchase price. After a conditional sale of the car had been effected in Indiana, the car was, with the knowledge, and at least implied consent, of vendor, taken to Louisiana. Upon vendee's default in payments, the car was repossessed in Louisiana, and then taken back to Indiana, where it was resold. Suit then was brought in Louisiana for a deficiency judgment. Plaintiff finance company, to whom the contract had been immediately assigned, argued that, by the law of Indiana, where the conditional sales contract was confected, the procedural requirement for the preservation of the right to claim a deficiency judgment was met. Holding that Louisiana law was applicable, the trial court concluded that since no appraisement, as required by the Louisiana Deficiency Judgment Act, was made, plaintiff's suit should be dismissed. The Third Circuit Court of Appeal affirmed, concluding that the whole affair had enough significant connecting elements and contacts

with Louisiana to justify application of Louisiana law. Judge Tate, speaking for the Court, said:

"To decide a case by the application of formal conflict-of-law principles is often not so much a matter of logic and the determination of the single correct answer by the logic-dictated application of such principles, as it is the selection by the court of the forum from among the competing intra-state and extra-state factors those which that court regards to be significant and which justify application of the particular conflict-of-law principle or principles which afford weight to the intra- (or extra-) state factors found to be significant by the court of the forum [Citing cases.] * * *

"As some of the cited sources note, in many instances the courts actually choose those formal conflict-of-law principles which justify the application of the law of the forum whenever there are sufficient factual contacts with the forum as to justify the application of its own law. It has in fact been suggested that an appropriate conflict-of-law approach is for the court of the forum frankly to apply its own law whenever through the factual elements of the case the forum state has any valid reason to apply its own law and policy, providing of course this does not violate constitutional full faith and credit requirements. See especially Currie, cited above. See also Bernkrant v. Fowler, 55 Cal.2d 588, 12 Cal.Rptr. 266, 360 P.2d 906 (1961), an important recent decision frankly utilizing the approach of balancing the interests of the forum against those of the foreign jurisdiction as a guide to deciding choice-of-law problems.

*    *    *    *    *    *

"We reach this result whether we regard the significant factor as being that the vehicle was sold to Louisiana residents for use in Louisiana, that the repossession actually took place thereafter in Louisiana, that Louisiana has a valid governmental interest in en-

forcing its public policy barring deficiency judgments when chattels of Louisiana debtors are repossessed in Louisiana and subsequently sold without an appraisement—or whether, as is actually the case, a combination of all these factors indicates that it is more appropriate for the Louisiana law to be applied by a Louisiana court in deciding this matter, than that of another forum which has less significant factual connections with the matter in litigation."

In concurring opinions in Doty v. Central Mutual Insurance Company, 186 So. 2d 328 (La.App. 3 Cir. 1966), cert. den. 249 La. 486, 187 So.2d 451 (1966), and Blanchard v. Blanchard, 180 So.2d 564 (La.App. 3 Cir. 1965), Judge Tate reiterated his view that this modern conflicts approach should be taken by Louisiana courts.

Defendant strongly relies on the language in Fry v. Lamb Rental Tools, Inc., 275 F.Supp. 283 (W.D.La.1967). That was a diversity case in which plaintiffs were minor children seeking recovery for the wrongful death of their parents in the crash of defendant's airplane. Relying on Doty and Blanchard, plaintiff argued that the more modern theory of "significant contacts" or "center of gravity" should be followed, under which theory Louisiana law would govern the rights of the parties. It was pointed out that the circumstances of the case were especially appropriate for the application of the theory. Choosing instead to apply Louisiana's traditional "place of the injury" conflicts rule for tort cases, Judge Putnam said:

" * * * The consideration set out by Judge Tate in the two appellate court decisions are most compelling and it is the opinion of this court that this rule will ultimately come to be the law of Louisiana. *But until an authoritative pronouncement is forthcoming in a case where the question is squarely presented, we cannot substitute our views for an established principle.*" (Emphasis added.)

If, by his last statement quoted above, Judge Putnam meant that in every case, even one with circumstances such as here, the Federal Court cannot decide a State Court would modify or reverse a previous position, we cannot agree. In Mason v. American Emery Wheel Works, 241 F.2d 906 (1 Cir. 1967), cited with approval in Necaise v. Chrysler Corp., 335 F.2d 562 (5 Cir. 1964), and Grey v. Haynes-Sammons Chemical Co., 310 F.2d 291 (5 Cir. 1962), persuaded by pure dicta in a recent Mississippi Supreme Court case and by the status of the law in other States, the Court concluded that the Mississippi Supreme Court was prepared to overrule a previous decision. There the Court said:

" * * * If the Supreme Court of Mississippi had recently reconsidered the rule it applied in Ford Motor Co. v. Myers, supra, [151 Miss. 73, 117 So. 362], and had decided to adhere to it on the ground of stare decisis, no doubt the federal courts would have had to accept the local law as so declared. But it would be gratuitous and unwarranted to assume that the Supreme Court of Mississippi would now so hold, when we bear in mind the readiness of other courts, in conservative jurisdictions at that, to overrule their earlier holdings and to bring their jurisprudence into accord with what is now the overwhelming weight of authority. * * *

\* \* \* \* \* \*

"Of course it is not necessary that a case be explicitly overruled in order to lose its persuasive force as an indication of what the law is. A decision may become so overloaded with illogical exceptions that by erosion of time it may lose its persuasive or binding force even in the inferior courts of the same jurisdiction. * * * We think it is fair to infer from this latest expression by the Supreme Court of Mississippi that it is prepared to reconsider and revise the rule it applied in Ford Motor Co. v. Myers whenever it may have before it a case that

squarely presents the issue. We have no doubt that when this occasion does come to pass, the Supreme Court of Mississippi will declare itself in agreement with the more enlightened and generally accepted modern doctrine."

See also Anderson v. Linton, 178 F.2d 304 (7 Cir. 1949) where the court decided that Iowa, having no controlling decisions on a certain legal question, would be willing to adopt the modern rule expressed in the Restatement.

If faced with the conflicts of law question before us, we believe that the Louisiana Supreme Court would be influenced by Judge Tate's enlightened expression in *Hulett, Doty,* and *Blanchard, supra.* We also believe the Court would be influenced by the trend in other jurisdictions. Numerous States have adopted the "most significant relationship" rule set forth in the Restatement (2nd), Conflicts of Law, § 332, or a similar rule as an escape from the rigidity of *lex loci contractus.* See, e. g., Baffin Land Corporation v. Monticello Motor Inn, Inc., 70 Wash.2d 893, 425 P.2d 623 (1967); Bernkrant v. Fowler, 55 Cal.2d 588, 12 Cal.Rptr. 266, 360 P.2d 906 (1961); Boston Law Book Co. v. Hathorn, 119 Vt. 416, 127 A.2d 120 (1956); Auten v. Auten, 308 N.Y. 155, 124 N.E.2d 99, 50 A.L.R.2d 246 (1954); W. H. Barber Co. v. Hughes, 223 Ind. 570, 63 N.E.2d 417 (1945).

In *Baffin, supra,* the Washington Supreme Court explained the absurdity of strict application of *lex loci contractus* in the modern world as follows:

"What if the vice president of Master Video had placed the rental agreement, unsigned, in his brief case and had left for a business appointment in Florida? Once aloft, he might [choose] to forego the various pleasures of air travel and make good use of the travel

time by perusing the unfinished business in his brief case. Somewhere en route, he affixes his signature to the Monticello Hotel television rental agreement. Should a court attempt to ascertain the approximate time of the signing during the flight? By interpolating the pilot's log, should the judge conclude that the law of North Carolina applies, since the airspace of the Tar Heel State was the actual scene or loci of the execution of the contract? Or should the governing law be the law of the state of destination? Of the state of embarkation? The absurdity of placing the choice of law *necessarily* on one fortuitous event—the place of execution—seems to be patent. It is not surprising then that at its 1960 meeting, the American Law Institute rejected the primacy of the place of making of the contract theory by a vote of 77 to 36. AM. LAW INSTITUTE, 37th ANNUAL MEETING PROCEEDINGS 505 (1961)."

■■ Of course, we realize that Louisiana's *lex loci contractus* rule is statutory (La.Civ.Code, art. 10) rather than jurisprudential. Thus Louisiana Courts are not free to discard the rule. But we feel that the Louisiana Supreme Court, in construing the statutory rule, would consider the appellate decisions by Judge Tate and the modern trend of emphasizing significant contacts. And we believe that where, as here, Loisuiana contacts are so significant,[2] Louisiana courts would give a party the benefits of Louisiana law.

Indeed, it might even be said that the second paragraph of Art. 10 of the Louisiana Civil Code provides a basis for applying the "most significant contacts" rule. It provides:

"But the effect of acts passed in one country to have effect in another coun-

---

2. Insured had lived in Louisiana, paying his premiums, for six years. During this time he made three significant business arrangements with defendant. Two of these were changes of beneficiaries of his policy; the other was the obtaining of a loan from defendant secured by his policy. Certainly the Louisiana Supreme Court would consider these contacts too significant to be overriden by a single fortuitous event—the delivery of the insurance contract in Wisconsin.

try, is regulated by the laws of the country where such acts are to have effect."

It is often said that where the parties made no choice, it is most likely that they expect the law of the State with the most significant contacts to apply. See, e. g., *Baffin, supra,* 425 P.2d at 627.[3]

We next turn our consideration to the sufficiency of the notices given to the insured before cancellation of his policy. Louisiana R.S. 22:177 provides:

"No life insurer shall within one year after default in payment of any premium, installment, loan or interest, declare forfeited or lapsed any policy issued or renewed, and not issued upon the payment of monthly or weekly premiums or for a term of one year or less, for non-payment when due of any premium, installment, loan or interest, or any portion thereof required by the terms of the policy to be paid, unless a written or printed notice stating:

"(1) The amount of such premium, installment, loan or interest, or portion thereof due on such policy; and

"(2) The place where it shall be paid and the person to whom the same is payable, shall have been duly addressed and mailed to the person whose life is insured or the assignee of the policy if notice of the assignment has been given to the insurer, at the last known post office address of such insured or assignee, postage prepaid by the insurer or any person appointed by it to collect such payment, at least fifteen and not more than forty-five days prior to the date when the same is payable.

"No policy shall in any case be forfeited or declared forfeited or lapsed until the expiration of thirty days after the mailing of such notice. Any payment demanded by such notice and made within the time limit shall be taken to be full compliance with the requirements of the policy in respect to the time of such payment.

"The affidavit of any officer, clerk or agent of the insurer or of anyone authorized to mail such notice that the notice required by this section has been duly addressed and mailed by the insurer issuing such policy, shall be presumptive evidence that such notice has been duly given. No action shall be maintained to recover under a forfeited policy, unless the same is instituted within two years from the day upon which default was made in paying the premium, installment, interest or portion thereof for which it is claimed that forfeiture ensued. This Section shall not apply to group insurance policies. Amended and reenacted Act 1958, No. 125."

R.S. 22:177 is a forfeiture statute, and thus must be construed strictly, Boring v. Louisiana State Insurance Company, 154 La. 549, 97 So. 856 (1923); Courtney v. Volunteer State Life Insurance Co., 187 So. 338 (La.App. 1st Cir. 1939); Jasper v. Mutual Life Insurance Co. of New York, 10 La.App. 259, 120 So. 714 (La.App. 2 Cir. 1929). Its purpose is "to protect the insured against losing his policy, through mere neglect to pay the premium, and also to give him a fair chance to meet the payments when due." [4] *Boring, supra,* 97 So. at 858.

3. Compare the following discussion in Universal C.I.T. Credit Corp. v. Hulett, supra, 151 So.2d at 709:
"Further, even if we regard this contract as governed by the law of the 'place where the contract was intended to have effect', it may occur to us that the contract contemplated several factual incidents intended to be effected in different places, including: (a) execution of the contract in Indiana; (b) removal of the car to Louisiana; (c) repossession of the car in the event of default, probably but not necessarily in Louisiana; and (d) in that event, repossession sale either in Louisiana or in Indiana."

4. We realize that the 1958 amendment to the notice statute was favorable to insurers, primarily by dispensing with the requirement that "the notice shall also state that unless such premium, interest and installment or portion thereof, then due, shall be paid to the corporation, or

■ The notice defendant contends was sent within the statutory fifteen to forty-five days requirement appears as follows: [5]

AETNA LIFE   Insurance Company<br>
Hartford 15, Connecticut

PAYMENT DUE

| Policy Number | Agency | Premium for | Date Payment Due |
|---|---|---|---|
| N 1725929 | MIL | 12 Months | May 1, 1962 |

Please enter any change of address below.
List other policies to be changed on reverse.

AETNA

| | | |
|---|---|---|
| Donald E. Lester | Premium | $2252.50 |
| Route 1 Box 208 | Interest | 451.18 |
| Natchitoches La | Due | 2703.68 |

Please make check payable to AETNA LIFE and
send with this notice in enclosed envelope to

AETNA LIFE INSURANCE COMPANY<br>
KASCHE & KASCHE, General Agents<br>
210 W. Michigan Street<br>
Milwaukee 3, Wisc.

IMPORTANT NOTICES ON REVERSE SIDE

———◆———

Before determining the sufficiency of this notice, we must isolate the reasons the policy was declared lapsed. It is clear to us that there are two.

The first is that Lester, Sr., defaulted in payment of the loan and interest. Indeed, defendant virtually admitted this as a reason for lapse in the notice dated July 2d, 1962, which stated:

"Although the automatic premium loan provision is in force, your policy does not have sufficient value to pay this premium by loan * * *. Unfortunately your policy has lapsed without value other than your right to apply for reinstatement because indebtedness exceeds the cash value."

The second reason the policy was declared lapsed is so obvious that it needs no explanation. It is failure to pay the premium due on May 1, 1962, within the thirty-one day grace period.

With these reasons for lapsing, defendant's notice, by the language in R.S. 22:-177, should have included "The amount of such premium [$2,252.50] * * * loan [$12,398.84] [and] interest [$451.18] * * * due on such policy; * * *." Since the notice sent by defendant con-

to the duly appointed agent or person authorized to collect such premium by or before the day it falls due, the policy and all payments thereon will become forfeited and void except as to the right to a surrender value, extended insurance or paid-up policy." Act No. 68 of 1906. This amendment, however, did not alter the purpose of the statute.

5. It is by no means clear that defendant's evidence suffices to prove that the notice of premium due was sent within the fifteen- to forty-five day time limit required in the notice statute. Defendant's only evidence is a letter from Aetna to attorney for plaintiff. This letter (Ex. D–6) states that premium notices are, by regular practice, mailed not more than forty-five days or less than fifteen days before the premium due date. The letter further states that Aetna's records show that notices for premiums due May 1st, 1962, were mailed on April 13, 1962, and that nothing further in Aetna's records indicates that the notice in question was not among those mailed on that date.

**1216**

tained only the amount of premium and interest due, making no mention of the amount of the loan, it was fatally insufficient, and defendant did not have the power to declare the policy lapsed.

We are therefore of the opinion plaintiff should recover the following: $50,000, the face amount of the policy, less, of course, $2252.50, the amount of the premium due May 1, 1962, $12,398.84, the amount of the outstanding loan, and $451.18, the interest due at the time of insured's death, or $34,897.48, with interest thereon at five per cent, from February 2, 1963, the date of the death of the insured, until paid.

With this conclusion, it is unnnecessary to consider plaintiff's estoppel argument.

A proper decree should be presented.