**Don E. LESTER, Jr., Plaintiff-Appellee-Cross Appellant,**

v.

**AETNA LIFE INSURANCE COMPANY,
Defendant-Appellant-Cross Appellee.**

No. 27539.

United States Court of Appeals,
Fifth Circuit.

Oct. 28, 1970.

Rehearing Denied and Rehearing En
Banc Denied Dec. 11, 1970.

Charles D. Egan, Benjamin C. King, Shreveport, La., for defendant-appellant.

Jack O. Brittain, Natchitoches, La., for plaintiff-appellee.

Before AINSWORTH, DYER and SIMPSON, Circuit Judges.

SIMPSON, Circuit Judge:

This is a Louisiana based, non-jury diversity case brought against Aetna Life Insurance Company (Aetna)[1] by the appellee, Don E. Lester, Jr., the sole beneficiary of a life insurance policy

---

1. Aetna Life Insurance Company is a Hartford, Connecticut domiciled corporation doing business in Wisconsin and Louisiana.

issued to his deceased father, Don E. Lester, Sr. to recover proceeds of the policy.[2] Lester's timely presented claim under the policy was denied by Aetna on the ground of lapse for non-payment of premium. Applying the Louisiana Notice Statute,[3] the district court held for the appellee, explaining that under the circumstances of this case the Louisiana Supreme Court would apply the law of Louisiana and not the law of Wisconsin. Judgment for $34,897.48[4] with interest and costs was entered and Aetna appealed. Appellee cross-appealed seeking penalties and attorneys' fees. We affirm the district court's judgment on direct appeal and deny relief to appellee on his cross-appeal.

The principal issues confronting us here are (1) the applicability of Louisiana law in preference to the law of Wisconsin; (2) the sufficiency of the notice of lapse given by Aetna to the insured; (3) whether or not Aetna was estopped to claim lapse of the policy; and (4) the failure of the trial court to impose penalties and award attorneys' fee (raised by the cross-appeal). Discussion and decision of issue (3) is rendered unnecessary by our disposition of issues (1) and (2).

The controlling facts were stipulated. For our examination they will be taken from the district court's opinion-order[5] with minor additions and modifications.

On May 1, 1952, a life insurance policy for the face amount of $50,000 was issued in Milwaukee, Wisconsin, by appellant's Wisconsin agent to Don E. Lester, Sr. By his application Lester, Sr. invoked operation of the automatic loan provisions of clause 8 of the policy (infra) and paid his first yearly premium of $2,252.50. Yearly premiums in that amount were due May 1 of each year thereafter, subject to a thirty-one day grace period.

It is necessary here to quote from or to paraphrase pertinent provisions of the policy. Clause 4 provided:

"All premiums shall be paid in advance at the Home Office of the Company, or to its authorized agent, in exchange for a receipt signed by its Secretary or Assistant Secretary and countersigned by the agent. If any such premium is not paid when due, this policy shall cease, subject to the values and privileges hereinafter described; *except that a grace of thirty-one days,* during which the policy shall remain in full force, will be allowed for the payment of any premium after the first. * * *" (Emphasis added)

Clause 6 provided that the company would make loans on the security of the policy for an amount not in excess of the net loan value[6] of the policy. The specified rate of interest on such loans was 5% per year.

Clause 8 contained an automatic loan provision which is available if due written request is made for its operation while there is no default in payment of premiums due. Essentially this clause provides that the amount of any premium due and not paid before the end of

---

2. This suit was originally filed in the state courts of Louisiana, but was timely removed under Title 28, U.S.C., Section 1441 et seq., to the court below which took diversity jurisdiction pursuant to Title 28, U.S.C., Section 1332.

3. Louisiana Revised Statute 22:177, note 14, infra.

4. The face amount of the policy less the amount of an unpaid policy loan and interest, and less the amount of the unpaid premium.

5. Lester v. Aetna Life Insurance Co., (W.D.La.1968) 295 F.Supp. 1208.

6. Clause 6 defined "Loan value" and "net loan value" respectively as follows:
"The loan value of the policy at any time shall be that amount which, with interest to the end of the current policy year or to the end of the current premium period if earlier, shall equal the cash value [i. e., cash surrender value] for the end of such policy year or period. The net loan value of the policy shall be the loan of the policy less any unpaid premium for the current premium period".

the 31-day grace period will automatically be loaned by the company and charged as an indebtedness secured by the policy. However, if the loan value should be insufficient to cover the whole premium due, no automatic premium loan would be made under the provisions of Clause 8 but the provisions of Clause 7 would apply.

Clause 7 contained three options available to the insured in the event the automatic premium loan provision should be insufficient to cover the total premium due. If none of the options provided in the policy were selected by the insured, the policy stipulated that insurance would be continued automatically as extended term insurance under Option (C). In case of any indebtedness against the policy, the extended term insurance would be for the sum insured less the indebtedness and for such a period as the cash value less the indebtedness would purchase.

Lester, Sr. timely paid his yearly premiums from his Wisconsin residence until 1957. At that time, with the full knowledge of Aetna he moved to Natchitoches Parish, Louisiana, where he lived until his death on February 2, 1963. Lester, Sr. paid premiums on the policy in Louisiana as they became due from 1957 through 1961. He paid a total of $22,525 in premiums from 1952 through 1961.

After moving to Louisiana, Lester, Sr. entered into several transactions with Aetna concerning the life insurance policy in question. In 1958, he changed the beneficiary of the policy to the administrator of his estate. Then on October 27, 1961, he again changed beneficiaries, this time naming the appellee, Lester, Jr., sole beneficiary. On August 2, 1961, Lester, Sr. obtained a policy loan of $12,398.84 from appellant, secured by the cash surrender value of the policy.

On May 1, 1962, the yearly premium became due. At that time the policy loan indebtedness totaled $12,850.02, composed of principal in the amount of $12,398.84 and interest due of $451.18. The cash surrender value of the policy on the May 1, 1962 anniversary was precisely $12,850.00. The 2¢ deficiency prevented the automatic policy loan provision from taking effect. Also, there was of course no cash value available to secure extended term insurance, because of the 2¢ excess of indebtedness over cash value.

A notice of premium payment due was issued to Lester, Sr. indicating that on the premium due date of May 1, 1962 he would owe the yearly premium of $2,252.-50 and $451.18 in interest due on the loan. *But the notice did not indicate that the automatic policy loan provision was ineffective.* Moreover, the record does not show with certainty when the notice was issued by appellant or received by Lester, Sr.

On July 2, 1962, 31 additional days after expiration of the 31-day grace period, Aetna issued a notice informing Lester, Sr. that the automatic loan provision was inoperative, because the policy did not have sufficient remaining value to pay the premium by loan, and, therefore, the policy had lapsed without value other than the right to apply for reinstatement. Aetna, by letter dated July 3, 1962, advised Lester, Sr. that he could apply for reinstatement by completing a form and remitting the overdue premium of $2,252.50. Lester, Sr. immediately mailed to appellant the completed application, a check for $2,703.68 (yearly premium plus loan interest) dated July 6, 1962, and a note reading: "Sorry, but Notice was misplaced. Please notify me if you reinstate". This check was good and would have been honored by the bank at any time it was presented between July 6, 1962 and January 23, 1963.

On August 8, 1962 Aetna advised its insured by letter that he must submit a physician's statement, including details of any cardiovascular findings, before his application could receive further con-

sideration.[7] Having received no response to its request for a physician's statement, the appellant by letter dated January 23, 1963 returned the decedent's check for $2,703.68. Ten days later, February 2, 1963, the insured died.

At the threshold we must consider whether or not the district court erred when it applied the Louisiana law in lieu of the Wisconsin law. The district court's reasoning was that since Louisiana was the place of the most "significant contacts" the Louisiana premium notice statute governed. The effect of this was to require Aetna before lapsing the policy, to give the insured sufficient notice both that his May 1, 1962 premium was due and also that the automatic loan provision covering late premiums was inoperative.

Conversely, under the law of Wisconsin, Aetna would have had no duty to give notice. The Wisconsin law contained no premium notice statute. Under it, therefore, the policy would have legally lapsed.

The argument for application of Wisconsin law is based on the traditional "lex loci contractus" doctrine, calling for application of the law where the contract was made, performed, or delivered. The policy involved here was of course "delivered" to Lester, Sr. in Wisconsin by appellant's Wisconsin agent. Hence on this appeal we must decide whether or not the district court correctly applied the "significant contacts" approach in lieu of the lex loci contractus or "place of delivery" approach.

It is helpful here to state and then reason from well established principles. In diversity cases, federal courts must apply the substantive law of the state. Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). When a federal court sitting in a diversity case is faced with an apparent conflict between relevant laws of two or more states, it must resolve the conflict in accord with the conflict of laws principles developed by the courts of forum state. Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). The rub is that it is sometimes not entirely clear what principles have been developed or how the developed principles should be applied in a new fact situation. When this occurs, the court must closely scrutinize the specific facts, law, and equities involved and divine what law the Supreme Court of the forum state would apply.

In this case the district court followed the *Klaxon* mandate and went to the Louisiana conflicts of law rule embodied in Article 10 of the Louisiana Civil Code which provides in pertinent part the following:

"The form and effect of public and private written instruments are governed by the laws and usages of the places where they are passed or executed.

But the effect of acts passed in one country to have effect in another country is regulated by the laws of the country where such acts are to have effect".

The district court recognized that from the first sentence of Article 10 the federal and state courts of Louisiana have evolved a general conflicts rule that the law of the "place where the insurance policy is delivered" must govern, citing Davis v. Insurance Company of North America, 268 F.Supp. 496 (E.D.La., 1967) and cases cited therein.[8] However, the district court declined to apply this rigid rule saying that the circumstances of this case required a more sophisticated and modern approach such as was applied by recent decisions of a Louisiana appellate court. Weight was given below to three recent decisions by Judge Tate of the Third Circuit of the

---

7. When the policy was originally purchased Aetna had rated up Lester by adding five years to his age in computing premiums because of a physician's finding of heart ailment.

8. For recent Louisiana Supreme Court reaffirmation of this doctrine, see Theye Y Ajuria v. Pan American Life Ins. Co., 245 La. 755, 161 So.2d 70 (1964).

Louisiana Court of Appeals.[9] In those cases Judge Tate has found authority in the second sentence of Article 10 for the "center of gravity" or "grouping of contacts" rule. These opinions are in line with recent developments in the decided cases providing an escape from the rigidity of the *lex loci contractus* rule. See, for example, Baffin Land Corporation v. Monticello Motor Inn, Inc., 70 Wash.2d 893, 425 P.2d 623 (Wash.1967); Bernkrant v. Fowler, 55 Cal.2d 588, 12 Cal.Rptr. 266, 360 P.2d 906 (1961); Boston Law Book Co. v. Hathorn, 119 Vt. 416, 127 A.2d 120 (1956); Auten v. Auten, 308 N.Y. 155, 124 N.E.2d 99, 50 A.L.R.2d 246 (1954); W. H. Barber Co. v. Hughes, 223 Ind. 570, 63 N.E.2d 417 (1945).

The lower court noted this modern trend in other jurisdictions as well as in the Louisiana Circuit Court of Appeals to erode the "place of delivery" rule and apply the "center of gravity" or "grouping of contacts" rule. The district judge reasoned that in the light of the modern approaches the Louisiana Supreme Court would modify or reverse its previous "place of delivery" position.[10] The trial court posited that Louisiana law applied because the only contact Wisconsin had was a single fortuitous event, i. e. delivery of the insurance contract in 1952, and most of the significant "contacts"[11] took place in Louisiana.

The court further argued that where, as here, the parties made no choice, it is more likely than otherwise that they expected the law of the state with the most significant contacts to apply.

These arguments are persuasive and perhaps were convincing when written, but speculation as to what the Louisiana Supreme Court would do with the choice of law issue is at an end. That court has spoken, and in speaking, has extinguished the theorizing of the trial court.

In the case of Johnson v. St. Paul Mercury Ins. Co., 256 La. 289, 236 So.2d 216 (decided March 30, 1970, rehearing denied May 4, 1970), the Louisiana Supreme Court, after a long and tedious examination of the merits of the modern approaches,[12] clearly and emphatically denounced the use of the "center of gravity" or "grouping of contacts" doctrines. In *Johnson* the court said that in their present state the "center of gravity" or "grouping of contacts" or related doctrines are in their formative stages and will not lend themselves to a sound declaration of new law. The message is loud and clear. The Louisiana Supreme Court is not ready to abandon the *lex loci* approach.

Moreover, we do not believe that *Johnson* may be distinguished by asserting that it is a *lex loci delicti* case inapplicable to *lex loci contractus* cases. The court in at least three places in its exhaustive

---

9. Universal C.I.T. Credit Corp. v. Hulett, 151 So.2d 705 (La.App. 3 Cir. 1963); Doty v. Central Mut. Ins. Co., 186 So.2d 328 (La.App. 3 Cir. 1966) (concurring opinion) cert. denied 249 La. 486, 187 So.2d 451 (1966) (the basis for denial of certiorari was not the concurring opinion of appellate court); Blanchard v. Blanchard, 180 So.2d 564 (La. App. 3 Cir. 1965) (concurring opinion). See also Judge Rubin's opinion in the recent Dean v. General Motors Corp., 301 F.Supp. 187, 194 (E.D.La.1969).

10. See Mason v. American Emery Wheel Works, 1 Cir. 1957, 241 F.2d 906, cited with approval in Necaise v. Chrysler Corp., 5 Cir. 1964, 335 F.2d 562; and Grey v. Haynes-Simmons Chemical Co., 5 Cir. 1962, 310 F.2d 291. These cases stand for the proposition that a federal

court may conclude that a state supreme court is prepared to overrule a previous decision and so hold.

11. Lester, Sr. had lived in Louisiana, paying his premiums, for six years. During this time he made three significant business arrangements with appellant. There were two changes of beneficiary under the policy and a policy loan was made secured by the policy. Also, Lester, Sr. owned another insurance policy issued by Aetna.

12. The court dismissed characterizations such as "center of gravity", "grouping of contacts", "most significant relationship", "contacts" and "interests" as doing little to serve as a guide or to establish a rule of law which may be applied with any degree of certainty.

opinion emphasized that it would not abandon the *lex loci* approach in favor of the modern trends.[13]

The Louisiana Supreme Court used *lex loci* in the broad generic sense embracing both *lex loci delicti* and *lex loci contractus*.

Furthermore, we are not convinced that the Louisiana Supreme Court would deviate from the "place of delivery" rule to avoid a harsh result in an individual case. In *Johnson*, an automobile passenger, resident in Louisiana, but injured in an Arkansas accident, was denied recovery by application of the Arkansas guest passenger statute. The Court of Appeals, Second Circuit, was reversed for applying Louisiana law on the basis that most of the "contacts" were in Louisiana. We are persuaded that if the Louisiana Supreme Court were faced with the case at bar, they would likewise apply the *lex loci contractus* rule notwithstanding the harsh consequences to the appellee,[14] provided a conflict exists.

Despite the above analysis, we affirm the district court's choice of law on different grounds since in our view no conflict is present. We go outside our own Circuit to find authority, in what is called the "false conflicts" rule in other jurisdictions. As we have stated above, in diversity conflict of laws cases federal courts are bound by the conflict of laws rule of the forum state. *Klaxon,* supra. We determine that here the *Klaxon* principle is inapplicable, because the parties and the court below have created a "false conflict". Gaither v. Myers, 1968, 131 U.S.App.D.C. 216, 404 F.2d 216, 224; Williams v. Rawlings Truck Line Inc., 1965, 123 U.S.App.D.C. 121, 357 F.2d 581, 586; Cf. Denny v. American Tobacco Corp., 308 F.Supp. 219, 222 (N.D.Cal.1970). See generally Currie, Notes on Methods and Objectives in the Conflict of Laws, in Selected Essays on the Conflict of Laws 177, 180 (1963); Cavers, The Choice-of-Law Process 88–96 (1965), passim; cf. Traynor, Is This Conflict Really Necessary?, 37 Texas L. Rev. 657 (1959). See also Comment, False Conflicts, 55 Calif.L.Rev. 74 (1967). But see Ehrenzweig, "False Conflicts" and the "Better Rule": Threat and Promise in Multistate Tort Law, 53 Va.L.Rev. 847 (1967). The real issue is whether or not appellant is bound by the Louisiana notice statute.[15]

---

13. "Plaintiff advocates a course here which takes us away from the 'clear-cut' rules of *lex loci* and compels acceptance of a doctrine not clearly defined in any respect. Such a change will involve this court in a legislative thought process in each case presented hereafter compelling the court to weigh all relevant interests in each fact situation and devise a rule for the solution of the case". 236 So.2d at 223.

\* \* \* \* \*

"Other than broad and vague generalizations that changing times, the speed of travel and the need to do justice in the individual case require a departure from *lex loci*, no compelling reasons have been advanced to support a departure from *lex loci*. We take it that the prime objective of the proponents of change is to do justice in the individual case." Ibid. at 223.

\* \* \* \* \*

"We are not satisfied that the abolition of *lex loci* is warranted. Accordingly, the judgment of the Court of Appeal is reversed and the judgment of the trial court is reinstated and made the judgment of this Court". Ibid. at 224.

14. One is inclined to refer to author Harry Golden's title, "For Two Cents Plain" at this point.

15. Louisiana Revised Statute 22:177:
§ 177. Written notice required before lapsing life policies

No life insurer shall within one year after default in payment of any premium, installment, loan or interest, declare forfeited or lapsed any policy issued or renewed, and not issued upon the payment of monthly or weekly premiums or for a term of one year or less, for non-payment when due of any premium, installment, loan or interest, or any portion thereof required by the terms of the policy to be paid, unless a written or printed notice stating:

(1) The amount of such premium, installment, loan or interest, or portion thereof due on such policy; and

(2) The place where it shall be paid and the person to whom the same is payable, shall have been duly addressed and mailed to the person whose life is insured or the assignee of the policy if notice of the assignment has been given to

■ A "false conflict" occurs "when one of two states related to a case has a legitimate interest in the application of its law and policy and the other has none, * * *." See Williams, text, supra; Currie, The Constitution and the Choice of Law: Governmental Interests and the Judicial Function, 26 U.Chi.L.Rev. 9, 10 (1958). For example, as the court said in *Gaither*, supra:

"Thus, we are not concerned with any real 'conflict' between the interests of Maryland and the District in this case. The fact that two states have different rules where all the factors are oriented to one state does not necessarily mean that there is a 'conflict' in which one state demands and the other rejects the application of its rule to a situation where the pertinent factors arise in two or more states. Where there is no such conflict of interest in a multistate situation, as this court and others have noted there is a 'false conflicts' situation",

and in *Williams*, supra:

"In sum, this case presents a classic 'false conflicts' situation. Adoption of the New York doctrine of estoppel will further the interests of New York, but will not interfere with any of the articulated policies of the District of Columbia. On the other hand, application of the District's rule allowing proof of sale would impinge upon New York's interests, without furthering any of the recognizable policies of the District. As a false conflicts case, our

decision becomes simple; we apply the estoppel rule of New York, the only jurisdiction with an interest in having its law applied to the issue of defining ownership of the vehicle. We conclude that the District Court erred in directing a verdict in favor of Goldberger".

■ In the case at bar, the laws of Louisiana and of Wisconsin as to notice differ materially, but only Louisiana has even the remotest interest in having its law applied.

Louisiana Revised Statute 22:177 [16] provides that no insurer shall declare lapsed any policy for non-payment of premium, installment, loan or interest unless a written notice stating "the amount of such premium, installment, loan or interest, or portion thereof due on such policy" is mailed to the insured at least 15 and not more than 45 days prior to the date when payable. Louisiana's interest in enacting this statute was to protect the Louisiana insured against "losing his policy, through mere neglect to pay the premium, and also to give him a fair chance to meet the payments when due". Boring v. Louisiana State Insurance Co., 154 La. 549, 97 So. 856 (1923). The statute embodies a state policy of Louisiana against forfeiture by its citizens of insurance benefits without notice.

Wisconsin has no such notice statute and on its face this may be to protect and promote the insurance industry of that state by relieving insurers of the burden of mandatory notice. Appellant does

the insurer, at the last known post office address of such insured or assignee, postage prepaid by the insurer or any person appointed by it to collect such payment, at least fifteen and not more than forty-five days prior to the date when the same is payable.

No policy shall in any case be forfeited or declared forfeited or lapsed until the expiration of thirty days after the mailing of such notice. Any payment demanded by such notice and made within the time limit shall be taken to be full compliance with the requirements of the policy in respect to the time of such payment.

The affidavit of any officer, clerk or agent of the insurer or of anyone au-

thorized to mail such notice that the notice required by this section has been duly addressed and mailed by the insurer issuing such policy, shall be presumptive evidence that such notice has been duly given. No action shall be maintained to recover under a forfeited policy, unless the same is instituted within two years from the day upon which default was made in paying the premium, installment, interest or portion thereof for which it is claimed that forfeiture ensued. This Section shall not apply to group insurance policies. Amended and reenacted Acts 1958, No. 125.

16. See footnote 15, supra.

business in Louisiana and Wisconsin and all other states with its home office being in Hartford, Connecticut (footnote 1, supra). Wisconsin has no interest in relieving appellant, a non-domiciliary insurance company, of the burden of giving notice in Louisiana to a Louisiana citizen that his premium to be paid in Louisiana is due. Wisconsin's only contact with this case occurred and ended long ago in the single, fortuitous event of delivery of the insurance policy in that state. Wisconsin's policy—assuming it has such a policy—of protecting its own domiciliary insurers against mandatory notice requirements would be neither furthered nor impinged upon by application of Louisiana law in this case.

On the other hand, the very purpose for which Louisiana enacted the notice statute is applicable here. Both the insured, Lester, Sr., and the appellee-beneficiary, Lester, Jr., were residents of Louisiana. As we have noted also, the insured has twice changed beneficiaries and obtained a loan from Aetna in Louisiana. Louisiana's interest in protecting its citizens against forfeiture without notice is clearly very much at stake. We conclude that only if appellant had been a domiciliary of Wisconsin would a "true" conflict of interest exist. We find no conflict of laws. Appellant is bound by the Louisiana notice statute.

 We next turn to the sufficiency of notice contention urged by Aetna. As did the district court, we conclude that appellant failed to give sufficient notice of lapse pursuant to La.R.S. 22:177. In reaching this decision we follow the determination reached by the district court.[17] So as not unduly to extend this already long opinion, we will not undertake to restate that court's views. Nevertheless, we adopt them without reservation.

Lastly, we consider appellee's contention on cross-appeal concerning the district court's failure to impose penalties and attorneys' fees. Appellee concedes on brief that there is no Louisi-

ana law which supports an award of penalties and attorneys' fees in this case. We note appellee's argument that it is unfair for him to have to pay an attorney to represent him in his efforts to recover insurance proceeds which are legally his property, but point out that we are without power to legislate a remedy where the Louisiana Legislature has failed to provide one. Under *Erie* we apply the state substantive law as we find it.

As to both the appeal and the cross-appeal we therefore affirm the judgment of the district court. Costs shall be taxed against the appellant, Aetna.

Affirmed.

### ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

#### PER CURIAM:

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.