**Robert O. FRANKLIN**

v.

**TEXAS INTERNATIONAL PETRO-LEUM CORPORATION.**

**Civ. A. No. 14422.**

United States District Court,
W. D. Louisiana,
Shreveport Division.

April 6, 1971.

S. Patrick Phillips, Peters, Ward, Johnson & Phillips, Shreveport, La., for plaintiff.

John M. Shuey, Shuey, Smith & Carlton, Shreveport, La., for defendant.

## OPINION

DAWKINS, Chief Judge.

In this diversity action, complainant alleges breach of a personal services employment contract by discharge without legal cause and seeks pecuniary damages. Defendant denies liability.

In June or July of 1967, Franklin was approached by a representative of Texas International Petroleum Corporation (formerly Nordon Corporation, Ltd.— hereinafter "Tipco") about the possibility of employment with that company. The employment agreement out of which this suit arises was reduced to writing in a letter dated September 12, 1967, prepared and signed by Mr. George Platt, then President of defendant. That "letter-agreement" provided in relevant part:

[Date and salutation omitted.]

"Re: Employment Agreement
"Dear Mr. Franklin:

As per our mutual agreement and understanding regarding your employment by Nordon Corporation Limited on or about October 15, 1967, Nordon agrees as follows:

[A] 1. Franklin shall have the title of Vice President, and be in complete charge of the Property Acquisition Department.

[B] 2. Franklin shall be elected to the Nordon Board of Directors immediately after reporting for work.

[C] 3. Franklin shall receive a salary of $1500 monthly.

[D] 4. Franklin shall be given a 5,000 share employee stock option for 1967 under the terms and conditions of the Employees Stock Option Plan currently in effect [Interlinear strike-out omitted].

In consideration for the above, Franklin agrees:

[E] 1. To devote full time and energy to the business of Nordon, and not engage in other activities of whatsoever nature connected with the oil industry either as an individual, consultant, or in any other capacity whatsoever representing other persons or firms engaged in the oil and gas production or drilling business, while in the employ of Nordon.

[F] 2. Not to purchase or otherwise acquire any producing or nonproducing oil or gas properties, royalties, minerals, leases or interests in same for himself or other firms or individuals while in the employ of Nordon.

[G] It is further mutually agreed and understood by both parties to this agreement that the obligations of both parties herein shall become binding to the assignee or successor of Nordon whether by virtue of sellout, merger or otherwise, excepting that a new successor to Nordon shall have the option to either continue Franklin's employment under the terms herein through October 15, 1972, or terminate same by paying to Franklin the sum of $1,000 per month for conulting services to be

performed for them by Franklin, payable each month in advance through October 15, 1972.

[H] The right of Nordon to terminate, upon two weeks notice, the employment of Franklin with cause, justification, or breach of the terms of this contract, is mutually herein agreed to, provided Nordon in the event of such termination pays Franklin $2,500 as full and complete severance pay.

\* \* \* "

Franklin signed the letter, which was mailed to him in Dallas, Texas, in Oklahoma City, Oklahoma, October 15, 1967, or shortly thereafter, and began work in Oklahoma City as manager of the property acquisition department. In February, 1968, Franklin was transferred to Shreveport, Louisiana. He continued employment with Tipco until May 29, 1968, and by letter dated May 31, 1968, he was formally advised of his discharge effective June 15, 1968.

The issues presented in this matter briefly may be summarized as follows:

1. *Choice of Law.* Are the rights and obligations flowing from the employment of Franklin and the subsequent discharge to be determined by application of the law of Louisiana or Oklahoma?

2. *Term.* Did Tipco employ Franklin for a term of five years, or was his employment terminable at the will of either party?

3. *Prior Termination by Franklin.* Did Franklin abrogate or rescind, or novate his employment contract by accepting the presidency of the corporation at the request of his employer at the board meeting on April 18th and 19th, 1968?

4. *Discharge.* Was Franklin's discharge on May 31, 1968, a breach

of the employment contract? If a breach, what is the proper measure of damages?

5. *Successor Corporation.* Is Tipco a successor corporation within the meaning of the employment agreement? (alternatively and in the event no breach is found).

## 1. CHOICE OF LAW

■ The choice of law question presented here is simply whether the substantive law of Louisiana or Oklahoma should be applied in determining the legal relationship resulting from the above quoted agreement and related juridical acts. Under Klaxon Co. v. Stentor Electric Mfg. Co., Inc.,[1] and its progeny,[2] we are bound to apply the choice of law rules of Louisiana, the forum State. It is necessary, therefore, to examine Louisiana's conflicts rules. The basic statutory conflicts rule is set forth in Article 10 of the Louisiana Civil Code:

"*Art. 10.* The form and effect of public and private written instruments are governed by the laws and usages of the places where they are passed or executed.

"But the effect of acts passed in one country to have effect in another country, is regulated by the laws of the country where such acts are to have effect.

\* \* \* "

The specific question presented here, of course, is whether Louisiana's or Oklahoma's substantive law of employment agreements, including parol evidence, should be applied. The answer to that question is not merely academic since Louisiana does not in circumstances such as alleged here require the mitigation of damages[3] while Oklahoma does require that an employee mitigate any damage

1. 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

2. *See* Bernhardt v. Polygraphic Co., 350 U.S. 198, 76 S.Ct. 273, 100 L.Ed. 199 (1956), with respect to the application of the forum State conflicts rule in a con-

tract situation. *See,* generally, Wright, Federal Courts, Chpt. 9 (2d Ed. 1970).

3. *See, e. g.,* Carlson v. Ewing, 219 La. 961, 54 So.2d 414 (1951), and cases cited therein.

he may incur from the breach of an employment agreement by his employer.[4]

Louisiana's jurisprudence until recently has been far from clear on choice of law problems such as are presented here.[5] In light of the lack of clear guidance from the Louisiana Supreme Court, this Court, as well as several State Courts, has examined choice of law problems in light of other jurisdictions [6] and prominent authorities advocating more "modern" approaches to the problem. In Lester v. Aetna Life Insurance Co.,[7] we discussed at length and applied the now widely accepted "significant contact" test upon which plaintiff strongly relies in its contention here that Louisiana law should be applied. Since our decision in Lester, however, the Louisiana Supreme Court has made its position on choice of law questions clear. In Johnson v. St. Paul Mercury Insurance Company,[8] that Court, with only one justice dissenting, clearly and unequivocally examined

and rejected the more "modern" approaches to choice of law questions and embraced the traditional "lex loci" approach. While that case dealt specifically with a tort action, it appears clear that the breadth of the decision was intended to encompass contracts as well.[9]

The Johnson decision, as noted, was decided after this Court's decision in Lester, but before our decision was reviewed and affirmed by the Fifth Circuit.[10] The Fifth Circuit panel, however, affirmed our decision on the grounds that the parties and the Court had created a "false conflict." In effect that Court concluded that Wisconsin had no interest in the matter, therefore, there was really no conflict of law problem present. While here we think Oklahoma had more "interests" in the present matter than Wisconsin had in Lester, we further believe that the Louisiana Supreme Court would not embrace the "false conflicts" approach which the Fifth Circuit applied.[11] The "false con-

4. See, e. g., Independent School Dist. No. 65 v. Stafford, 208 Okl. 542, 257 P.2d 1092, 1095 (1953) and cases cited therein.

5. See, Comment, 38 Tul.L.Rev. 726 (1964), for a survey of the various manners in which conflicts problems have been approached by Louisiana Courts.

6. For example, the leading case of Babcock v. Jackson, 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963).

7. 295 F.Supp. 1208 (W.D.La.1968).

8. 256 La. 289, 236 So.2d 216 (1970).

9. See Couch, Choice of Law * * *, 45 Tul.L.Rev. 100 (1970) for a comprehensive analysis of the Johnson case.

10. Lester v. Aetna Life Insurance Company, 433 F.2d 884 (5th Cir. 1970).

11. Professor Couch has succinctly summarized the relationship between the two decisions, Couch, supra, at 113 n. 64:
"On October 28, 1970, the Fifth Circuit affirmed Judge Dawkins's decision in which he applied the law of Louisiana (the state of interest) instead of the law of Wisconsin (the state of contracting) on the basis that the Louisiana Supreme Court, if faced with the problem, would follow the modern trend. Lester v. Aetna

Life Ins. Co., Civil No. 27539 [433 F.2d 884] (5th Cir., Oct. 28, 1970) ; * * * In view of the Johnson decision, the Fifth Circuit could not uphold the district court's opinion—in effect, Judge Dawkins had guessed wrongly. Tactfully criticizing the Johnson opinion, the court conceded that in both tort and contract cases the supreme court was simply not ready to depart from the traditional ways.

"But the Fifth Circuit still managed to affirm, though not on the original basis. Analyzing the interests of Louisiana and Wisconsin, Wisconsin had no such interest; therefore, Lester presented a false conflict. Because this was a false conflict, the court concluded that the Louisiana choice-of-law cases (presumably including Johnson) are not applicable. This is an interesting and significant interpretation of Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487 [61 S.Ct. 1020, 85 L.Ed. 1477] (1941). Apparently, Lester excepts false conflict cases from the Klaxon rule that in diversity cases the conflicts law of the forum determines the choice-of-law issue.

"The Fifth Circuit, of course, reached the correct result. But reconciling its decision with the Johnson opinion is difficult. To say that Lester presented a more false conflict than Johnson is impossible. The decision does, however, un-

flict" doctrine requires the same type of interest analysis and contact analysis which the Louisiana Supreme Court expressly and emphatically rejected in *Johnson.* "False conflict" analysis leads to the same degree of uncertainty as the more "modern" conflict approaches and that uncertainty appears to be the compelling reason the Louisiana Supreme Court fully embraced the *lex loci* approach.

■ Accordingly, being strictly bound as we are by the pronouncement of the Louisiana Supreme Court in this diversity matter, we reluctantly are compelled to follow the *lex loci* rule and apply Oklahoma law on the substantive issues of law presented. In this case, that application is not particularly incongruous. The contract not only was entered into in Oklahoma but performance was contemplated there and the greater part of its performance under the contract occurred there. While perhaps a different result can be argued to obtain under interest or contact analysis, under *Johnson* we are precluded from examining such factors.

## 2. TERM

■■ While the employment agreement does not specify a primary term of employment, the agreement is facially and internally so inconsistent with respect to the primary term as to create ambiguity on this issue and to allow the introduction of parol evidence under the traditional parol evidence rules which Oklahoma adheres to.[12] The ambiguity is created by the incorporation by reference of a stock option which provides for employment at defendant's "pleasure." Yet, the agreement in what we have designated as paragraph "G" grants plaintiff rights to employment or consultation fees for the remainder of a five-year term (until October 15, 1972,) in the

event of sell-out or merger, etc. Then, in paragraph "H" the agreement precisely sets out the grounds and consideration for terminating the contract for *cause,* etc. This latter clause certainly indicates that a term was contemplated since a breach was deemed necessary for termination. It certainly would be unusual to require a breach for termination where no term is contemplated. In light of all these factors, and, moreover, since defendant drafted the agreement, which must be strictly construed against it, we find that the agreement is sufficiently ambiguous with respect to the existence of a primary term of employment as to allow the introduction and consideration of parol evidence on that issue.

The evidence introduced at the trial, subject to defendant's objection which we now dispose of adversely to it, convinces us that a five-year term was contemplated by the parties. Besides the directly contradictory testimony of the principal individual parties, Mr. Franklin and Mr. Platt, the manner in which Tipco handled the termination of employment and its manner of formally communicating that termination to Franklin convinces us that defendant's officers and personnel directly involved in this matter thought that the agreement provided for a term of five years. An example of the apparent understanding of a five year term by defendant's personnel is reflected by the fact that at the time of plaintiff's discharge and immediately thereafter, there was an attempt by the defendant to find grounds for Mr. Franklin's abrogating the agreement. If the parties themselves had considered his employment on a monthly basis there would be no need to find grounds for an abrogation, since defendant would have the right to discharge Franklin at any time. After a careful review of the evidence, we are convinced

---

derscore the havoc wrought by *Johnson,* pointing out that in its quixotic search for certainty the Louisiana Supreme Court has only created more uncertainty."

12. *See, e. g.,* Warren v. Pulley, 193 Okl. 88, 141 P.2d 288, 290 (1943). The parol

evidence rule is, of course, substantive for purposes of the *Erie* doctrine. See, Annot. 141 A.L.R. 1043; Am.Jur.2d § 1017.

that Franklin was led reasonably to believe that the employment agreement he was entering provided for a term of employment for five years.

### 3. PRIOR TERMINATION BY FRANKLIN

Defendant argues that Franklin abrogated, novated or rescinded the employment agreement by his acceptance of the presidency of the corporation in mid-April, 1968. His gaining the presidency was the result of inter- and intra-corporate maneuvering in order to maintain the financial stability of defendant corporation. Franklin accepted the presidency at the request of the Board of Directors with the assurance that he would be given informal aid and assistance by Platt. While Franklin clearly accepted additional duties, in particular in dealing directly with bank officials in an important financial transaction, the general nature of his employment was the same.

We think defendant's claim that the letter-agreement was abrogated by Franklin's acceptance of the presidency is refuted by the actions of the Board itself. The Board, in granting a stock option to the new vice president, David Spencer, made specific reference to Franklin's prior agreements in order to achieve some sort of parity between the two officers with respect to such options. It is clear at this point that the Board did not consider that the prior agreements with Franklin, which included the stock option rights, had been abrogated. We need not here consider all the circumstances of Franklin's acceptance of the presidency. At the time of his acceptance, we are convinced that none of the parties involved saw this as an abrogation or rescission of the prior employment agreement.

We find what was contemplated in the acceptance of the presidency was the acceptance of *additional duties* in the nature of direct financial negotiations. That Franklin was clearly apprised of the additional duties is made clear by his own actions in requiring informal advice from Platt.

After full consideration of all facts presented, we find that the original employment agreement was amended rather than abrogated or rescinded, and that Franklin assumed additional duties and responsibilities as president—in particular, an active and direct role in a critical financial transaction.

### 4. DISCHARGE

Upon the facts as found, the next question to be answered is whether Franklin's discharge was a breach of the employment agreement by defendant or whether he was discharged with "cause, justification, or breach of the terms" of his agreement.

Defendant contends that Franklin's discharge was with "justification" because of his inability to perform adequately as president which duties required direct dealings with bankers in a complex financial transaction. It is argued that Franklin lacked the experience, expertise, and proper degree of affability in dealing with the bankers in this critical negotiation. Of course, the Board of Directors is the proper body to make such determinations and Courts are reluctant to second-guess such business judgments absent demonstrable bad faith on the part of the Board. While we are cognizant of the intra- and inter-corporate maneuvering (involving perhaps something less than the highest standards of business morality), on the evidence presented, we are unable to say that Franklin's discharge was without justification.[13]

Evidence was presented in an effort to demonstrate that he had taken a rigid position in the negotiations, and that

13. While able counsel for plaintiff in his briefs has asserted through elaborate inference from the meager evidence presented grounds for finding bad faith and that Franklin was merely being manipulated by the Board, no sufficient factual foundation for these allegations and inferences was presented at the trial. We, therefore, cannot without resorting to speculation accept those contentions.

position was deemed catastrophic by the majority of the Board and that Franklin was not suited for the type of his new position. The Board, therefore, felt that in order to save the corporation from financial disaster Franklin would have to be discharged and Platt be again elected to the presidency.

 Franklin was not unaware of this maneuvering and the conditions under which he accepted the presidency and should have been placed on notice as to the greater responsibilities and possible adverse consequences in relation to his original employment agreement by his acceptance of such additional duties. Under the facts presented, we cannot say that Franklin's discharge as president by the Board was without justification.

Accordingly, under the clear terms of what we have designated as paragraph "H," Robert O. Franklin is entitled to a judgment in his favor for the sum of $2,500.00 as the agreed-upon compensation upon discharge with justification, plus costs and legal interest.

Proper decree should be presented by plaintiff, after approval as to form by defendant, within twenty days.