[No. 38165. En Banc. March 24, 1967.]

BAFFIN LAND CORPORATION, *Appellant*, v. MONTICELLO
MOTOR INN, INC., *et al., Respondents.*\*

\*Reported in 425 P.2d 623.

*Moore, Walstead, Hallowell & Mertsching* and *Jerome Walstead,* for appellant.

*Cartano, Botzer & Chapman,* for respondent Eleanor M. Clark.

FINLEY, C. J.—This action was brought by Baffin Land Corporation, a Delaware corporation, as assignee of Master Video Systems, Inc., to collect delinquent payments under a television rental agreement with an option to purchase made in 1958 with Matthew G. Clark, who was operating what was then known as the Monticello Hotel in Longview, Washington. At the time the contract was made, Mr. Clark was operating the hotel, now known as the Monticello Motor Inn, Inc., on behalf of the marital community composed of himself and his wife, Eleanor M. Clark. The agreement was signed in Longview, Washington, by Matthew G. Clark and by a salesman of Master Video and forwarded to New York, where it was signed by a vice president of Master Video, a Delaware corporation duly authorized to do business in Washington. Under the provisions of the agreement, a binding contract was not formed until the signature of the vice president was affixed in New York.

Master Video then did the necessary wiring and installed the television sets in the Monticello Hotel. Monthly rental payments were mailed from Washington to the lessor in New York. Acting under the agreement, Master Video serviced the television sets to a certain extent until the provision of the contract calling for such servicing was deleted by mutual consent.

Subsequently the Clarks were divorced, and the property settlement they had agreed upon was approved in the divorce proceeding. Under the terms of the settlement, certain real and personal assets which had previously been held as community property went to Eleanor M. Clark, and she waived any further interest in the Monticello Hotel or its assets. The agreement also provided that Matthew would indemnify Eleanor and save her harmless from any liability on obligations arising from the operation of the hotel, including costs and attorney fees incurred in any necessary defense by her.

After a trial to the court below, judgment for the plaintiff was entered against Monticello Motor Inn, Inc., and Matthew G. Clark for delinquent rentals of $14,507.40 plus interest and sales tax upon the rental. From the portion of the judgment denying any recovery against Eleanor M. Clark, plaintiff appeals.

The trial court, relying on such decisions of this court as *Escrow Serv. Co. v. Cressler,* 59 Wn.2d 38, 365 P.2d 760 (1961); *Achilles v. Hoopes,* 40 Wn.2d 664, 245 P.2d 1005 (1952); and *La Selle v. Woolery,* 14 Wash. 70, 44 Pac. 115 (1896), held that the obligations of the contract were governed by the rule of lex loci contractus. Since the last act necessary to form a binding contract occurred in New York, and since the contract was therefore made or executed in New York, the trial court held that the obligations of the contract and its effect were determined and governed by the law of New York. The court below further found the law of New York to be such that neither the defendant Eleanor M. Clark nor the former marital community composed of Eleanor M. and Matthew G. Clark has at any time

been obligated or liable on the contract, and that the plaintiff has never had any enforceable claim against any property of the defendant Eleanor M. Clark which was formerly the community property of the individual defendants here or against any separate property of Eleanor M. Clark.

In the recent case of *Pacific Finance Corp. v. J. Ed Raymer Co.*, 68 Wn.2d 211, 412 P.2d 120 (1966), this court was asked to adopt the "center of gravity" or "most significant relationship"[1] approach to the contract choice of law problem. In declining to do so, we noted that a financial institution was involved and that it could have protected itself by having the wife execute her guaranty in Washington or by making certain Washington law would govern by expressly so providing. We further stated, 68 Wn.2d at 215, 412 P.2d at 123:

> In any event, we are not convinced that the fact pattern in the instant case is a particularly significant one. For this and the policy reason implicit in the principle of stare decisis, we adhere to our previous decisions and refrain *at this time* from adopting the "center of gravity" or "points of contact" approach to the contracts-choice-of-law problem involved herein. (Italics in original.)

The time for adoption of the center of gravity or most significant contacts approach has now come, and we do so by our decision in the instant matter.

The rule of lex loci contractus was first applied by this court in the second *La Selle* case, *La Selle v. Woolery*, 14 Wash. 70, 44 Pac. 115 (1896). This decision, which was on rehearing, departed from and overruled the well-reasoned decision in the first *La Selle* case, *La Selle v. Woolery*, 11 Wash. 337, 39 Pac. 663 (1895). The result of the first *La Selle* case has been considered commendable, and the rule

---

[1]The "most significant relationship" theory, as used in the Restatement, and the "center of gravity" theory are generally considered to be the same, and the two expressions are used interchangeably. Comment, 51 Calif. L. Rev. 762, 774 (1963); *Haag v. Barnes*, 9 N.Y.2d 554, 175 N.E.2d 441 (1961). We will use either expression as roughly synonymous with what we call the most significant contacts approach.

traceable to the second *La Selle* case has been considered unfortunate. See note, 11 Wash. L. Rev. 166 (1926); *Maag v. Voykovich,* 46 Wn.2d 302, 280 P.2d 680 (1955), concurring opinion of Hill, J. The rule of lex loci contractus, or the law of the place of contracting, was adopted by the first Restatement of the Law of Conflict of Laws, even though it had never been a majority rule in the United States, simply because of what was once considered the inexorable, but is now the largely discredited, theory of vested rights. Reese, *Conflict of Laws and the Restatement Second,* 28 Law & Contemp. Prob. 679 (1963); Am. Law Institute, 37th Annual Meeting Proceedings 494 (1961). The primary virtues of the rule, as found in the first Restatement, were thought to be simplicity and certainty. Cavers, *Re-restating the Conflict of Laws: the Chapter on Contracts,* in XXth Century Comparative and Conflicts Law 349 (1961). The application of the theoretically simple formula to complex phenomena often failed to produce the desired certainty and simplicity. *Ibid.* The lex loci contractus rule is not the easy, certain, and predictable panacea for all cases that it might superficially seem to be. *Leflar, Conflict of Laws, Contracts, and the New Restatement,* 15 Ark. L. Rev. 163, 171 (1961). Some practical difficulties which may render its utility dubious can be best demonstrated by a hypothetical.

What if the vice president of Master Video had placed the rental agreement, unsigned, in his brief case and had left for a business appointment in Florida? Once aloft, he might choose to forego the various pleasures of air travel and make good use of the travel time by perusing the unfinished business in his brief case. Somewhere en route, he affixes his signature to the Monticello Hotel television rental agreement. Should a court attempt to ascertain the approximate time of the signing during the flight? By interpolating the pilot's log, should the judge conclude that the law of North Carolina applies, since the air-space of the Tar Heel State was the actual scene or locus of the execution of the contract? Or should the governing law be the law of the state of destination? Of the state of embarkation? The

absurdity of placing the choice of law *necessarily* on one fortuitous event—the place of execution—seems to be patent. It is not surprising then that at its 1960 meeting, the American Law Institute rejected the primacy of the place of making of the contract theory by a vote of 77 to 36. Am. Law Institute, 37th Annual Meeting Proceedings 505 (1961).

Is it not more rational and more consistent with standards of equity, fair play, and justice to attempt to ascertain which state had the most significant contacts with the agreement in dispute? 16 Am. Jur. *Conflict of Laws,* § 42 (1964); Stumberg, Principles of Conflict of Laws 240-41 (3d ed. 1963). The grouping of contacts or center of gravity theory admittedly lacks some of the apparent predictability and certainty of the lex loci contractus formula. But again, predictability and certainty are not necessarily the only values which should govern the choice of the applicable law. The place of execution can be given important and possibly controlling effect under the significant contacts approach. However, other factors such as the apparent intention of the parties, the place of performance, and the place under whose law the agreement will be most effective should be accorded appropriate consideration in determining what state's law should govern litigated disputes involving contracts with multistate aspects.

The only other argument advanced in favor of continued adherence to the rule of lex loci contractus is based on the policy reasons implicit in the doctrine of stare decisis. Too often courts justify decisions simply by stating in effect, as Justice Holmes observed, "[s]o it was in the time of Henry IV." Holmes made the further observation that:

> . . . . [J]ust as the clavicle in the cat only tells of the existence of some earlier creature to which a collar-bone was useful, precedents survive in the law long after the use they once served is at an end and the reason for them has been forgotten. The result of following them must often be failure and confusion from the merely logical point of view. Holmes, The Common Law 35 (1881).

We think lex loci contractus is an unfortunately outstanding example of a rule which, in our modern multistate commercialism, has outlasted any usefulness it may ever have had, if it ever had any. As this court has said before in the case of *State ex rel. Fin. Comm'n v. Martin,* 62 Wn.2d 645, 665, 384 P.2d 833, 845 (1963), a case in which an earlier, no longer acceptable decision was overruled:

> To be uniformly applied, and equally administered, the rules of law should be both just and adaptable to the society they govern. A bad law uniformly administered is equally unjust and uniformly bad. If a rule laid down by the courts proves in time to be a bad one, applying the bad rule evenly does not provide equal justice for all. It may be equal, but it will not be justice. . . . Rules of law, like governments, should not be changed for light or transient causes; but, when time and events prove the need for a change, changed they must be.

■ We have determined that we should no longer adhere to the rule of lex loci contractus. We therefore adopt what we consider to be the better rule, *viz.,* that the law of the state with which the contract has the most significant relationship, except perhaps in the unusual case of usury, will govern the validity and effect of a contract. See Restatement (Second), Conflict of Laws § 332 (Tent. Draft No. 6, as modified 1960). In so doing, we follow the lead of various other states which have adopted a similar rule as an escape from the rigidity of lex loci contractus. See, *e.g., Bernkrant v. Fowler,* 55 Cal. 2d 588, 360 P.2d 906 (1961); *Boston Law Book Co. v. Hathorn,* 119 Vt. 416, 127 A.2d 120 (1956); *Auten v. Auten,* 308 N.Y. 155, 124 N.E.2d 99, 50 A.L.R.2d 246 (1954); *W. H. Barber Co. v. Hughes,* 223 Ind. 570, 63 N.E.2d 417 (1945). The rule we adopt is more flexible and thus better adapted to deal with the contracts with multistate aspects which are becoming the rule today and making commonplace choice of law problems such as this one. The rule we approve here also gives much more emphasis to the desires and expectations of the parties, as the state with the most significant relationship is the state chosen by the parties, if an actual, valid choice is made.

See Restatement (Second), Conflict of Laws § 332a (Tent. Draft No. 6, 1960). Where no choice is made, it is most likely that the parties would expect the law of the state with the most significant contacts to be applied.

We note also that our conclusion as to the change effected by the instant decision is supported by the fact that our state legislature has enacted the Uniform Commercial Code and particularly UCC § 1—105. When this section becomes effective as RCW 62A.1-105 on July 1, 1967, this court would be required to apply the law of the state to which the transaction, if covered by the code, bears an "appropriate relation." We deem this rule to be a departure from lex loci contractus and suggestive of the significant relationship approach. See comment, UCC § 1—105. As a final observation, it is our opinion that applying the law of the state with the most significant relationship to the contract will produce results which are less arbitrary and more just.

Today we adopt only so many rules and guidelines as are necessary to handle the problems before us, although we acknowledge our reliance on the work of the drafters of the second Restatement as the basic stepping stone in our attempt to arrive at a better contracts choice of law doctrine. See Leflar, *op. cit. supra,* at 171-72. The basic rule is that the validity and effect of a contract are governed by the local law of the state which has the most significant relationship to the contract, except in the case of usury and except that the details of performance are still said to be governed by the local law of the place of performance. See Restatement (Second), Conflict of Laws, (Tent. Draft No. 6, Introductory Note, § 2 1960).

Application of the new rule we adopt may at first present some difficulties. The approach is *not* to count contacts, but rather to consider which contacts are most significant and to determine where those contacts are found. A general listing of factors which often are significant in regard to a particular contract is found in Section 332b of Tentative Draft No. 6 of the Restatement, as modified in November

(1960). Section 332b, as modified from the original Tentative Draft No. 6, is discussed in Weintraub, *The Contracts Proposals of the Second Restatement of Conflict of Laws—A Critique,* 46 Iowa L. Rev. 713 (1961), where the modified section is quoted as follows:

(1) In the absence of an effective choice of law by the parties, consideration will be given to the following factors, among others, in determining the state with which the contract has its most significant relationship:

(a) the place of contracting,

(b) the place of negotiation of the contract,

(c) the place of performance,

(d) the situs of the subject matter of the contract,

(e) the domicile, residence, nationality, place of incorporation and place of business of the parties,

(f) the place under whose local law the contract will be most effective.

(2) If the place of contracting, the place of negotiating the contract and the place of performance are in the same state, the local law of this state ordinarily determines the validity of the contract, except in the case of usury (see § 334d) and as stated in §§ 346e to 346n. (Footnote omitted.)

■■ Since there was no express choice of law determined by the parties in the present instance, we shall apply the above factors to the facts before us. The place of contracting was in New York. The place of negotiation of the contract was at least partially in Washington since both Matthew G. Clark and a salesman for Master Video signed the contract in Longview before mailing it to New York for final acceptance. At least the major portion of the performance of the contract was to, and did, take place in Washington, as it was in Washington that Master Video, among other things, installed the master antenna and amplifier system with an internal distribution network within the hotel, installed numerous television outlets in various rooms so that sets could be moved about, and delivered and connected up the television sets. It was also in Washington that Master Video performed such repair and maintenance as was accomplished under the contract before it was mod-

ified. If there can be said to be a subject matter of the instant contract, it was the television sets which were installed in Washington. Matthew G. Clark was domiciled in and a resident of Washington at the time of contracting, and Master Video, a Delaware corporation, was authorized to and was doing business in Washington.

Of the contacts discussed, those involving the places of contracting, negotiation, and performance seem to be the most important in the present case, with emphasis here on the place of performance since it was one of the parties sole place of business, the place where the parties actually did business together, and the place whose laws the parties most likely had in mind in this type of a transaction. This emphasis on the place of performance is supported by Section 3461 of Tentative Draft No. 6 of the new Restatement, if the contract before us is considered to be a contract for the rendition of services, as it seems to have been initially when Master Video was obligated to install, maintain, and repair the television sets. Section 3461(1), which establishes that the most significant contact in a contract for the rendition of services is in that state where the contract requires that the services, or a major portion of them, be rendered, seems to require the application of Washington law.

On the other hand, if this lease-option agreement be considered a contract for the sale of chattels, the same basic result obtains from the application of the concept found in Section 346g. In keeping with the emphasis on place of performance in this type of contract, Section 346g states that, in the absence of an effective choice of law by the parties and except as to minute details of performance, the validity and effect of a contract for the sale of an interest in chattels shall be governed by the local law of the state where, under the terms of the contract, the seller is to deliver the chattel. The reason behind this rule, of course, is that the point of delivery is that point where the seller has usually completed his major obligations and also that point where, normally, the stage of the transaction most significant

to the parties has been reached. See the comment to Section 346g of Tentative Draft No. 6. Applying the theory of Section 346g to the instant case, we find that possession of the television sets was to pass to Matthew G. Clark, as buyer, in Longview, Washington. We thus find that various approaches to the problem lead us to determine that Washington is the state of the applicable law because it is the state with the most significant relationship to the contract.

We come now to the question of what the applicable Washington law is. It is conceded that the agreement, signed by the husband for the benefit of the community business, was initially a community obligation. There is no question but that the former community property now held by respondent Eleanor M. Clark is liable for at least the $588 owing at the time of separation, since it was a community obligation incurred during marriage. *Hanson v. Hanson,* 55 Wn.2d 884, 350 P.2d 859 (1960); *McLean v. Burginger,* 100 Wash. 570, 171 Pac. 518 (1918). Respondent Eleanor M. Clark argues, however, that her liability should be limited to the amount owing on the contract at the time the community was dissolved.

■ Her first point of argument on this tack is that the contract was divisible or severable. We disagree. A contract is divisible or severable when performance of each party can be divided into equivalent and corresponding parts. 6 Williston, Contracts § 860 (3d ed. 1962). In this case, the most important part of Master Video's performance was in doing the wiring, setting up the antenna system, delivering and installing the television sets, and generally preparing them to operate. All of this performance by Master Video transpired before the commencement of the monthly rental payments by the hotel. Thus this case is distinguishable from *Kenworth Sales Co. v. Salantino,* 154 Wash. 236, 281 Pac. 996 (1929), a case cited by respondent. This being true, the contract involved here was entire or indivisible.

In another argument in support of her position that all the indebtedness which became due after the dissolution of the community should be her husband's separate liability,

respondent cites such cases as *MacKenzie v. Sellner,* 58 Wn.2d 101, 361 P.2d 165 (1961), and *Yates v. Dohring,* 24 Wn.2d 877, 168 P.2d 404 (1946). In those cases, however, the obligations were incurred after the marriage had become defunct and the community was dissolved. In the present case, respondent makes no contention that the marriage became defunct before September 28, 1960, a date over two years after the agreement with Master Video was made. As a matter of fact, respondent concedes that, if Washington law is applied, the contract created a community obligation of at least $588, the amount owing on September 28, 1960.

Plaintiff-appellant directs our attention to our decision in *McLean v. Burginger, supra.* In *McLean,* the husband and wife were divorced after the husband had executed certain promissory notes, given for loans obtained for the benefit of the community. The husband defaulted, and the holder of the notes obtained a judgment which the court held could be satisfied out of any property which had been the couple's community property prior to the divorce, including property now held by the wife alone.

Another case similar to the one before us in that it involved a continuing obligation created during coverture and extending after the termination of the community relationship is *Capital Nat'l Bank v. Johns,* 170 Wash. 250, 16 P.2d 452 (1932). In the *Johns* case, the husband executed a continuing guaranty of the indebtedness of Modern Utilities Company up to a certain amount. This obligation initially bound the community since the community received benefit in having money lent to a company in which the community held stock. The couple then separated, and the property settlement confirmed by the divorce decree provided that certain community property would go to the wife and certain community property, including the Modern Utilities Company stock, would go to the husband as his separate property. After the dissolution of the community and the preliminary decree of divorce, the company officials executed a new note to the bank which the guar-

anty was held to cover. Although it is difficult to see how the wife could have received direct benefit from the extension of time after the separation when she had no further interest in the company, it was held that the bank's judgment created a lien against former community property held by the wife, since the guaranty was an original obligation which bound all of the parties immediately. The maximum possible obligation was established immediately although the eventual exact amount was not. We deem the principle of the *Johns* case to be controlling here.

Indeed in some respects we think that the instant matter presents even a more apt occasion on which to find that the entire obligation bound the community than the *Johns* case. If the lease with an option to purchase before us be considered a contract for the purchase of television sets, as we have indicated before it could be so considered, then the wife, as part of the community, received the benefit of the contract immediately and will be presumed to have bargained for something in exchange for her interest in the sets in the property settlement agreement.

If the contract be considered as one for the performance of services or as a lease, the amount of total remaining liability on the 5 year lease was easily determinable and could be taken into consideration in arriving at the terms of the settlement agreement. The fact that respondent required an indemnity provision in the agreement shows an awareness of the possibility that she would be determined to be bound on various obligations incurred or continued in the operation of the hotel. It further indicates that possible future demands for money were or should have been considered by respondent in arriving at the terms of the settlement agreement. Even with an indemnity agreement, holding the risk of having to pay on an obligation for which one is no longer receiving benefit is worth something, particularly, as here, when the possibility that the one spouse would encounter future financial difficulties seems to have been within the realm of consideration of the other spouse.

■ The property settlement with its indemnity agreement did determine, in effect, the character of the obligation as between Matthew and Eleanor Clark, just as the agreement determined the status of the parties' interest in the television sets to be Matthew's separate property. An agreement between spouses, however, cannot determine the nature of the obligation as to, or affect the rights of, creditors holding obligations which have become fully binding before the dissolution of the marital community. Thus the plaintiff in this action is entitled to satisfy its judgment out of any property held by either spouse which was formerly the couple's community property and which is otherwise subject to execution.

The portion of the judgment denying any recovery against Eleanor M. Clark is reversed, and the case is remanded for proceedings consistent with this opinion.

HILL, ROSELLINI, OTT, HUNTER, HAMILTON, and HALE, JJ., concur.

DONWORTH and WEAVER, JJ., concur in the result.

---

June 13, 1967. Petition for rehearing denied.