[Civ. No. 14578. Fourth Dist., Div. One. Dec. 24, 1976.]

PETER P. GAMER, Plaintiff and Appellant, v.
duPONT GLORE FORGAN, INC., Defendant and Respondent.

**COUNSEL**

Peter P. Gamer, in pro. per., and White, Price, Peterson & Robinson for Plaintiff and Appellant.

MacDonald, Halsted & Laybourne, Peter Brown Dolan, Hervey, Mitchell, Ashworth & Keeney and Thomas R. Mitchell for Defendant and Respondent.

## OPINION

WHELAN, J.*—Peter P. Gamer, plaintiff, has appealed from a judgment entered February 7, 1975, in his class action against duPont Glore Forgan Incorporated (Glore Forgan), defendant, to recover allegedly usurious interest paid to Glore Forgan. The judgment followed the granting of Glore Forgan's motion for summary judgment.

The action was commenced on August 30, 1973.

Plaintiff is a California lawyer who in 1966, while practicing in Beverly Hills, arranged for a securities margin account with Walston & Co., Inc. (Walston) at the Beverly Hills office of that firm.

The agreement signed by plaintiff in opening the margin account was on a printed form prepared by Walston. It contained 20 numbered paragraphs, numbers 4, 18 and 19 of which were as follows:

"4. All securities and commodities or any other property, now or hereafter held by you, or carried by you for the undersigned (either individually or jointly with others), may from time to time and without notice to the undersigned, be carried in your general loans and may be pledged, repledged, hypothecated or rehypothecated, or loaned by you to either yourselves as brokers or to others, separately or in common with other securities and commodities or any other property, for the sum due to you thereon or for a greater sum and without remaining in your possession and control for delivery a like amount of similar securities or commodities."

"18. The provisions of this agreement shall in all respects be construed according to, and the rights and liabilities of the parties hereto shall in all respects be governed by, the laws of the State of New York."

"19. The provisions of this agreement shall be continuous and shall cover individually and collectively all accounts which the undersigned may open or reopen with you, and shall inure to the benefit of yourselves, your successors and assigns and shall be binding upon the undersigned, and/or the estate, executors, administrators and assigns of the undersigned."

The agreement showed on its face that Walston was a member of the New York Stock Exchange and contained provisions covering the

---

*Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

customs of stock exchanges for margin accounts (see Charles H. Meyer, Law of Stockbrokers and Stock Exchanges (1931)). Among such customs is the provision that the broker may use shares purchased for the account of the customer as collateral to obtain loans.

Walston, on July 2, 1973, transferred to Glore Forgan all of its accounts and all contractual rights in connection with them, and thereafter was declared bankrupt.

The transfer agreement between Walston and Glore Forgan provided: "In reliance upon the respective representations and warranties of the parties herein and in the Master Agreement and upon the terms and subject to the conditions hereinafter set forth, on the Closing Date, Walston sold, conveyed, assigned, transferred, delivered and set over to duPont, and duPont purchased, received and accepted from Walston, all of Walston's right, title and interest in and to all accounts and related securities positions on Walston's books at the opening of business on July 2, 1973 arising from the pledge, loan, borrowing, hypothecation, delivery or failure to make delivery of customer securities, and all other accounts, including all cash balances and securities positions relating to the purchase, sale, transfer and recording of customer transactions."

Walston was made a party defendant, but proceedings against it were ordered stayed by a United States District Court in the State of New York, in bankruptcy.

From November 1966 throughout 1973, plaintiff maintained a debit balance in his margin account with Walston, on which he was charged interest at varying rates. From July 1973 through January 10, 1974, the margin account was financed by Glore Forgan. From July 1, 1973, to September 26, 1973, Glore Forgan charged interest at a rate which ranged from 9½ percent to 12¼ percent.

California Constitution, article XX, section 22, fixes a maximum interest rate that may be charged of 10 percent per annum, except by certain classes of lenders, such as banks and personal property brokers.

On September 18, 1973, the California Legislature amended the Personal Property Broker's Act to permit stockbrokers to qualify thereunder. Glore Forgan was so licensed on September 26, 1973, and since then has been authorized to charge interest at rates up to 30 percent per annum (Fin. Code, § 22451).

Plaintiff's claim against Glore Forgan, therefore, is limited to interest paid between July 1, 1973 and September 26, 1973.

New York law at all times relevant has permitted the charging of interest at a rate higher than that charged by Glore Forgan.

The issues before us are whether the choice of law provision set out in paragraph 18 of the margin account is invalid as a matter of law because contained in a contract of adhesion; and, if not, whether it is invalid because (a) there was insufficient relationship with the State of New York between the parties to the contract and the subject matter of the contract; or (b) the application of the choice of law provision would do violence to the declared policy of California against usurious transactions; and finally, whether Glore Forgan has the benefit of the choice of law provisions, if it is valid.

Plaintiff states the choice of law provision amounts to a waiver of his rights under the California usury laws. It is clear, however, that the margin account contract is not couched in terms of waiver and that it is not directed toward an evasion of California's laws against usury.

Civil Code section 3513 provides: "Anyone may waive the advantage of a law intended solely for his benefit. But a law established for a public reason cannot be contravened by a private agreement." That section refers to an expressed waiver of the benefits of a statute, such as the statute of limitations, or any other statute specifically mentioned or made identifiable.

The concept of a choice of law provision, if otherwise valid, necessarily contemplates possible differences between the law of the state where the contract is executed and that of the state whose law is chosen.

■ The term "contract of adhesion": " ' . . . refers to a standardized contract prepared entirely by one party to the transaction for the acceptance of the other; such a contract due to the disparity in bargaining power between the draftsman and the second party must be accepted or rejected by the second party on a "take it or leave it" basis without opportunity for bargaining and under such conditions that the "adherer" cannot obtain the desired product or service save by acquiescing in the form agreement.' " (*Lomanto* v. *Bank of America,* 22 Cal.App.3d 663, 668 [99 Cal.Rptr. 442].)

■ However, such contracts are valid and enforced according to their terms unless they are ambiguous (*Schmidt* v. *Pacific Mut. Life Ins. Co.,* 268 Cal.App.2d 735, 737 [74 Cal.Rptr. 367]); but any ambiguity or uncertainty is to be interpreted against the drafter of the contract (*Neal* v. *State Farm Ins. Cos.,* 188 Cal.App.2d 690, 695 [10 Cal.Rptr. 781]; 14 Cal.Jur.3d, Contracts, §§ 1, 125, 157).

■ It requires more than a showing that a contract was on a printed form prepared by one of the parties to make it invalid as a contract of adhesion. Very many of the contracts upon which people generally rely and whose provisions are performed faithfully by both parties are on such forms. "[T]he impact of these standardized contracts can hardly be exaggerated. 'Most contracts which govern our daily lives are of a standardised character. We travel under standard terms, by rail, ship, aeroplane, or tramway. We make contracts for life or accident assurances under standardised conditions. We rent houses or rooms under similarly controlled terms; authors or broadcasters, whether dealing with public or private institutions, sign standard agreements; government departments regulate the conditions of purchases by standard conditions.' " (*Neal* v. *State Farm Ins. Cos.,* 188 Cal.App.2d 690, 694.)

In his sole declaration in opposition to the motion for summary judgment, plaintiff did not say he did not read the contract he signed, did not say that any of its clauses was not understood, or was contrary to what he expected, did say that subsequently he "examined so-called 'customer agreements' from five other brokerages . . . substantially identical to the form signed by me."

■ California does not have any public policy against a choice of law provision, where it is otherwise appropriate.

In *Windsor Mills, Inc.* v. *Collins & Aikman Corp.,* 25 Cal.App.3d 987, 995, fn. 6 [101 Cal.Rptr. 347], the court said: "The parties may expressly agree on what law shall govern their contract. [Citation.] Although the form may be characterized as a contract of adhesion [citation], the choice-of-law provision contained in such a contract is usually respected."

The Supreme Court in *Smith, Valentino & Smith, Inc.* v. *Superior Court,* 17 Cal.3d 491, 494 [131 Cal.Rptr. 374, 551 P.2d 1206], in holding valid a choice of forum provision, a more drastic thing than a choice of law provision, said, "[C]hoice of law provisions are usually respected by

California courts." (See also Rest.2d Conflict of Laws, § 187, com. b.)

The choice of law provision is not invalid as a matter of law, because contained in a contract of adhesion.

The court in *Frame* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 20 Cal.App.3d 668, 673 [97 Cal.Rptr. 811], commented:

"As a general rule, it is said that contracting parties may by agreement specify what law is to control their contract if 'enforcement of the contract by a local court in accordance with the foreign law agreed to be controlling does not result in an evasion of the settled public policy or a statute of the forum protecting its citizens.' [Citation.]

"We recognize that the choice-of-law question is not foreclosed by the existence of an applicable California statute where New York State has substantial contacts with the transaction and the parties, if no attempt to evade California law appears. But an agreement designating applicable law will not be given effect if it would violate a strong California public policy. (*Ury* v. *Jewelers Acceptance Corp.* (1964) 227 Cal.App.2d 11, 20 . . .; cf. *People* v. *Globe & Rutgers Fire Ins. Co.* (1950) 96 Cal.App.2d 571, 575 . . . [upholding contract provisions designating applicable law].)"

■ California has a strong public policy against usury, that is, the charging and receiving interest on the loan or forbearance of money in excess of the rate allowed by law. It has no strong public policy against a particular rate of interest so long as the charging of that rate is permitted by law to the specific lender.

Some of the reasons for holding California's policy against usury is not offended by the contract under discussion bear upon the sufficiency of the relationship between the State of New York and the contract, its subject matter, and its performance.

The trial court in its memorandum decision expressed an opinion the contract had a reasonable relationship to the State of New York, but a substantial relationship only to California. That is true only if by substantial is meant that which is perceptible to the senses.

The rule of the Restatement Second of Conflict of Laws is as follows:

Section 187:

"(1) The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.

"(2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either

"(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

"(b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

"(3) In the absence of a contrary indication of intention, the reference is to the local law of the state of the chosen law."

Section 203:

"The validity of a contract will be sustained against the charge of usury if it provides for a rate of interest that is permissible in a state to which the contract has a substantial relationship and is not greatly in excess of the rate permitted by the general usury law of the state of the otherwise applicable law under the rule of § 188."

Glore Forgan's undenied statement is that its principal place of business was in New York, where it kept its offices, borrowed and repaid money, and bought and sold stocks.

Plaintiff's declaration stated that the "customer agreement" was signed in California, all plaintiff's payments were to California offices, and all plaintiff's orders, requests for loans of money or extensions of credit were made through California offices. It stated also that since 1970 most of his shares were purchased on the Pacific Coast Stock Exchange.

■ Those statements of plaintiff do not create an issue of fact as to the substantial relationship between the contract and the State of New York.

Absent such a choice of law provision, if the general rule as to conflicts of laws were to be applied, New York law would apply as to the validity of all stock sales and purchases made in New York. The law of the place where the contract is to be performed, or *lex loci solutionis,* is to be applied in matters relating to performance. "The residence of the parties to the litigation is . . . without significance in determining what law is to be applied. . . . Stock and commodity transactions are ordinarily governed by the law of the place where the order is executed, irrespective of where the order is given or where the parties reside." (*Op. cit.,* Meyer, pp. 676-677.) (See also *Brooks* v. *People's Bank,* 233 N.Y. 87 [134 N.E. 846]; *Solomon* v. *Newburger,* 35 F.2d 328; *Hoyt* v. *Wickham,* 25 F.2d 777; *Mullinix* v. *Hubbard,* 6 F.2d 109; *Jacobs* v. *Hyman,* 286 F. 346; *In re Clement D. Cates & Co.,* 283 F. 541; *Lamson Bros. & Co.* v. *Turner,* 277 F. 680; *Wilhite* v. *Houston,* 200 F. 390; *Berry* v. *Chase,* 146 F. 625; *Lehman* v. *Feld,* 37 F. 852; *Gordon* v. *Andrews,* 222 Mo.App. 609 [2 S.W.2d 809]; *Claiborne Commission Co.* v. *Stirlen* (Mo.App.) 262 S.W. 387.)

Whether California's policy against usury would invalidate a contract provision for choosing the law of the State of New York which permits a rate of interest on loans as high as 12¼ percent must be decided with consideration given to the nature of the contract.

The contract did not call for any fixed rate of interest, but a customary rate which might fluctuate with changes in the money market. Purchases of securities on margin call for the advancing of money by the brokerage house, which may itself borrow money for that purpose.

The contract also permitted the making of "short sales" by the plaintiff, which involves the selling of shares not owned by the customer in the expectation the sales so made may be covered by purchases made at a lower price. Unfortunately the shares sometimes rise in price before settlement date. Some people consider such transactions to be a form of gambling.

The activities of brokers and members of any national securities exchange with regard to purchases on margin are subject to regulations of the Securities Exchange Commission and the Securities Exchange Act of 1934, as amended.

The regulations of the Federal Reserve Board impose requirements on the extension of margin credit by banks, brokers, dealers and other nonbank lenders (see 15 U.S.C.A. § 78g).

■ We may take judicial notice of the historical fact that within the three years last past what is known as the prime rate of interest has been as high as 9 percent.

So far as purchases made on the New York Stock Exchange or the American Stock Exchange are concerned, New York is the place of performance of the contract (see Law of Stockbrokers and Stock Exchanges, *supra,* p. 677, and cases cited). It is there also that settlement by member brokers is made. It is the making of such a settlement for shares purchased on margin that constitutes the extension of credit for which interest is charged.

■ Having in mind the foregoing, we hold that the particular contract in question, which by its choice of law provision permitted a charge of interest legal in New York though in excess of the legal rate then permitted in California, did not offend against a policy of California law.

In this context, "substantial relationship" and "reasonable relationship" are equivalent to each other. By analogy, California Uniform Commercial Code section 1105 provides that the parties may contract to be bound by the laws of another state that has a "reasonable relation" to the transaction. The code section, however, refers to the application of "this Code," (Commercial Code), not California law in general.

An Illinois court has reached the conclusion that New York law would be applied under a like provision of a margin contract (*Mell* v. *Goodbody & Co.,* 10 Ill.App.3d 809 [295 N.E.2d 97, 99-100]).

The judgment is affirmed.

Brown (Gerald), P. J., and Cologne, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied February 17, 1977.