[No. 44663. En Banc. October 19, 1978.]

JOSEPH E. O'BRIEN, ET AL, *Appellants,* v. SHEARSON
HAYDEN STONE, INC., *Respondent.*

*Carl G. Koch* and *Terence P. Lukens* (of *Karr, Tuttle, Koch, Campbell, Mawer & Morrow*), for appellants.

*Fredric C. Tausend* and *Rex B. Stratton* (of *Schweppe, Doolittle, Krug, Tausend & Beezer*), for respondent.

DOLLIVER, J.—Plaintiffs O'Brien appeal from the dismissal by summary judgment of their class action suit against the defendant brokerage firm. The material facts are not in dispute. Plaintiffs allege Washington residents who maintained margin accounts with defendant were charged usurious interest rates on those accounts between April 1974 and January 1975. A margin account is a separate portion of a customer's general account in which a customer purchases securities financed through credit extended by a broker in the form of a demand loan.

The first trial judge certified the class of plaintiffs as all Washington residents who had margin agreements with defendant or one of its corporate predecessors during the period from January 31, 1972, through January 31, 1975. Shearson Hayden Stone has maintained a branch office in Seattle since the merger of Shearson, Hammill and Company and Hayden Stone, Inc., in September 1974. Shearson opened that office originally in February of 1969. While most members of the class dealt with the Seattle office, class representatives O'Brien contracted in Los Angeles with that branch and maintained their account there at all times, even subsequent to their moving to Washington in 1969.

Each member of the class signed a margin agreement with defendant providing "This agreement . . . shall be governed by the laws of the State of New York." New York

law authorizes security brokers and dealers registered pursuant to the Securities Exchange Act of 1934, 48 Stat. 881, to charge interest at rates up to 25 percent per annum on customers' secured debit balances. Defendant is so registered.

The defendant charges interest on margin accounts at fluctuating rates based on (1) the rate it must pay to commercial banks on money borrowed by it to facilitate the loans to its customers (called the "broker's call money rate"—a rate higher than, but generally paralleling, the prime rate), and (2) the flat increment of between one–half to 2 percent (depending on the outstanding balance), assessed against the customer's account as its commission for providing the loan. Shearson borrows the necessary money in New York.

Interest rates are recomputed and interest is calculated on the 16th of each month with the exception of December and January. These operations are done by computers and are automatic. Any interest charge that is unpaid during any interest period is added to that month's debit balance; interest during the next month is then charged on the sum of the unpaid loan amount plus the unpaid interest of the preceding month or months. The computation of interest is based on a 360–day year.

In early 1974, the broker's call money rates escalated sharply so that beginning in April some of Shearson's customers were charged interest on their margin accounts which exceeded 12 percent per annum. Subsequently, Shearson reprogrammed its computers to limit interest charged to residents of Washington and two other states to 12 percent. Later in 1974, after Shearson, Hammill and Company merged with Hayden Stone, Inc., all accounts of the two entities were integrated into one computer system. Defendant alleges that system could not practically be programmed to extend different rates of interest to Washington residents. Thereafter, Washington residents were again charged interest at monthly rates which exceeded 12 percent per annum until a declining broker's

call money rate brought the rate below the 12 percent level in January 1975.

After affirming the class certification of the first trial judge, the second trial judge granted defendant's motion for summary judgment holding New York usury law governed this case and under New York law the rates of interest charged were not usurious. Plaintiffs by letter requested the court to rule also on the issue of how the rates of interest were to be computed for purposes of applying the usury law. They maintained the interest rate could not exceed 12 percent during any month while the agreement was in effect. The court concluded the rate of interest is to be calculated by determining the total amount of interest charged the debtor during the entire time the debtor maintained a margin account with the defendant. That is, the average rate of interest over the life of the account was to be used rather than the rate applied to each monthly period.

Two questions come to us on appeal. The first concerns the applicable state law and the second the method used to compute interest on a margin account.

I

This is not a case in which the law chosen by the parties to govern their rights is in doubt. *See Baffin Land Corp. v. Monticello Motor Inn, Inc.*, 70 Wn.2d 893, 899, 425 P.2d 623 (1967); Restatement (Second) Conflict of Laws § 188 (1971). The customer's margin agreement, signed by the O'Briens and other members of the class, provides that New York law shall govern. New York law has been chosen by the parties. In *Baffin* there was no express choice of law by the parties. In that case, when we adopted the "most significant relationship" choice of law rule for contract cases, we cited with favor the factors to be used to determine the most significant relationship as are contained in the Restatement (Second) Conflict of Laws § 188, Law Governing in Absence of Effective Choice by the Parties

(1971) (at that time Tentative Draft No. 6, § 332, as modified in November (1960)). In this case, where the law of the state has been chosen by the parties, we believe the language of the Restatement (Second) Conflict of Laws § 187 (1971), as it relates to the law of the state chosen by the parties, to be useful in determining the law to be applied particularly in a case such as this which involves the question of usury. *See Crawford v. Seattle, R. & S. Ry.*, 86 Wash. 628, 150 P. 1155 (1915). The provisions of section 187 are as follows:

§ 187. Law of the State Chosen by the Parties

(1) The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.

(2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either

(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

(b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

(3) In the absence of a contrary indication of intention, the reference is to the local law of the state of the chosen law.

In applying the tests contained in section 187 to this case, three questions are posed: (1) Is the permitted New York rate of 25 percent interest contrary to a fundamental policy of Washington? (2) Does Washington have a materially greater interest than New York in the determination of the usury issue? and (3) If there had been no choice of law by the parties, would Washington, under section 188, be the

state of applicable law? We answer all three questions in the affirmative.

■ RCW 19.52 concerns interest rates and usury. RCW 19.52.020 provides that 12 percent is the maximum "for the loan or forbearance of any money". RCW 19.52.005 declares the policy of the state in enacting this chapter is:

> to protect the residents of this state from debts bearing burdensome interest rates; and in order to better effect the policy of this state to use this state's policies and courts to govern the affairs of our residents and the state; and in recognition of the duty to protect our citizens from oppression generally.

This is a clear and unequivocal statement by the people of Washington through their elected representatives, and we hold it to be the declaration of the type of fundamental policy contemplated by section 187. *See* Restatement (Second) Conflict of Laws § 187, comment *g,* at 567–69 (1971).

Next, does Washington have a materially greater interest than New York in the determination of the usury issue? The interest rates charged citizens of the state of Washington are involved here, and unquestionably the State of Washington has a materially greater interest in the welfare of its citizens and the impact the decision in this case will have upon them than does the State of New York. *See* Restatement § 187, comment *g,* at 567–69.

■ Lastly, which state would be the state of applicable law under section 188? The test in section 188 is the state with "the most significant relationship to the transaction." *See Baffin Land Corp. v. Monticello Motor Inn, Inc., supra.* The determination of which state meets the test is made by evaluating five factors: (a) the place of contracting; (b) the place of negotiation of the contract; (c) the place of performance; (d) the location of the subject matter of the contract; (e) the domicile, residence, nationality, place of incorporation and place of business of the parties. Restatement § 188(2).

All Washington residents who had margin agreements with defendant compose the class certified. Though discovery was incomplete at the time of the summary judgment, it appears the vast majority of class members contracted and negotiated with, made payments to, and maintained their margin agreements at the Washington offices of the defendant. Although defendant was incorporated in Delaware and borrowed money in New York, as to persons dealing with the local offices, clearly the most significant contacts were with Washington.

A further analysis may be made under the Restatement § 188(3), which states:

> (3) If the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied, except as otherwise provided in §§ 189–199 and 203.

The Restatement (Second) Conflict of Laws § 203 (1971) concerns usury, and is as follows:

> The validity of a contract will be sustained against the charge of usury if it provides for a rate of interest that is permissible in a state to which the contract has a substantial relationship and is not greatly in excess of the rate permitted by the general usury law of the state of the otherwise applicable law under the rule of § 188.

While New York, as previously illustrated, is not the state with the most significant relationship under section 188(2), it can be argued it does have a substantial relationship to the transaction. However, the maximum permissible rate of interest in New York is 25 percent. This is clearly "greatly in excess of the rate [12 percent] *permitted* by the general usury law of the state of the otherwise applicable law under the rule of § 188"—the State of Washington. (Italics ours.) Restatement § 203.

We do not believe, however, that plaintiffs O'Brien who represent the class meet the tests herein stated. Although they lived in this state during the time pertinent to this case, their margin account was at all times maintained in

Los Angeles. All of their dealings, negotiations, and payments were conducted through defendant's Los Angeles office. Under the significant contacts analysis, their account would appear to be governed under California law. Restatement (Second) Conflict of Laws § 188(2) (1971). *Gamer v. duPont Glore Forgan; Inc.*, 65 Cal. App. 3d 280, 135 Cal. Rptr. 230 (1976), held in a similar situation that the New York usury law would be applied to the contract.

While the certified class of plaintiffs is not drawn with sufficient precision, this flaw is not fatal to the class action. CR 23(c)(4)(B) vests the court with authority to divide the class into subclasses when appropriate to treatment of particular issues. In applying the identical federal provision, courts have not hesitated to allow a class action to proceed after division into subclasses. *See Carr v. Conoco Plastics, Inc.*, 423 F.2d 57 (5th Cir. 1970), *cert. denied,* 400 U.S. 951, 27 L. Ed. 2d 257, 91 S. Ct. 241 (1970); *Green v. Wolf Corp.*, 406 F.2d 291 (2d Cir. 1968); *Feder v. Harrington,* 52 F.R.D. 178 (S.D.N.Y. 1970); *Sol S. Turnoff Drug Distribs., Inc. v. N.V. Nederlandsche Combinatie Voor Chemische Industrie,* 51 F.R.D. 227 (E.D. Pa. 1970).

Accordingly, on remand the trial court is directed to divide the certified class into subclasses which will allow proper treatment under the conflict of laws analysis set forth herein.

## II

The further question of whether the plaintiffs were charged usurious rates depends upon the manner in which the interest rate charged is computed. The trial court held the interest must be spread over the entire period of the loan and not considered in month–by–month installments. Plaintiffs argue each month must be considered separately to determine whether usury occurred. For this proposition they rely on 91 C.J.S. *Usury* § 28(a) (1955), at page 603, which provides:

> In determining whether or not a contract is usurious the entire period must be considered, and in general if

the return exacted of the debtor does not exceed the lawful rate for the whole period there is no usury; but if any particular part of the period is in effect treated separately by the parties and excessive interest for such part of the period is exacted, the contract is usurious, even though the interest payable in other parts of the period is such that the average rate for the whole term does not exceed the lawful maximum.

It should be noted that the asserted rule appears to be supported only by a few cases arising under Texas law. We need not be bound by it. *See Southwestern Inv. Co. v. Hockley County Seed & Delinting, Inc.,* 511 S.W.2d 724 (Tex. Civ. App. 1974).

The law is well settled in this state that, where the rate of interest is constant in a loan for a set term, it will be measured over the full term of the loan to determine whether it is usurious. *See Seattle Trust Co. v. Morgan,* 167 Wash. 567, 9 P.2d 1079 (1932); *Lewis v. Vassar,* 132 Wash. 480, 232 P. 312 (1925). Plaintiffs would have us distinguish margin accounts from a loan at a fixed rate of interest. They note when the interest rate varies monthly depending on the fluctuations of the broker's call rate, the interest for each monthly period is computed separately by the brokerage firm. Because a separate rate is assessed each month, they contend each month must be treated as a separate entity for purposes of determining whether or not usury has occurred. We do not believe this distinction is determinative.

It has long been the rule in this state that, in determining whether a contract for the payment of money is usurious "where the contract is susceptible of two constructions, the one lawful and the other unlawful, the former will be adopted." *German Sav., Bldg. & Loan Ass'n v. Leavens,* 89 Wash. 78, 82–83, 153 P. 1092 (1916); *Seattle Trust Co. v. Morgan, supra.* It is the further rule that "in determining whether or not a contract is usurious, the entire period of the contract must be considered." *Seattle Trust* at 571.

Defendant argues we must look at the full term of the loan or forbearance to determine the *effective* as opposed to

the *stated* rate of interest and only if the effective rate for the term exceeds 12 percent per annum is there a usurious rate. We agree. *See Lewis v. Vassar, supra; Hensel v. Bissell,* 110 Wash. 568, 188 P. 774 (1920).

With the margin accounts here, so long as the customer continues to do business with the broker and so long as sufficient equity remains in the account of the customer to provide sufficient collateral for the loan (*see* requirements of Regulation T, 12 C.F.R. §§ 220.1–220.8 (Rev. January 1, 1977)), the debit balance does not become due. Only at the time the debit balance is repaid can the total interest charged to the customer be calculated and the effective rate of interest be determined. At that time, it can be determined whether over the term of the debit balance "any greater interest, sum or value for the loan or forbearance of any money, goods or things in action than twelve percent per annum" has been charged. RCW 19.52.020. Plaintiffs argue the computation of monthly interest rates and their charge to the margin account for the month in question should control. But this places the focus on the wrong place: the monthly stated rate rather than actual term rate.

Plaintiffs also assert that, because the margin account can be called on demand of defendant, it is not an open-ended loan. *But see* R. Ritteriser, *Margin Regulations and Practices,* New York Inst. of Finance (1970). But regardless of the characterization of the loan, the crucial and uncontroverted facts are that there are no specific time limits on the loan nor are specific installments or set dollar payments required. Thus, the effective rate of interest applied to the life of the loan cannot be computed until the end of the period occurs.

The precise question raised in this case was considered by the California Supreme Court in *McConnell v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 21 Cal. 3d 365, 578 P.2d 1375, 146 Cal. Rptr. 371 (1978). This decision was published subsequent to the oral argument in this case. In *McConnell,* the California court stated:

The present case is quite different from those decisions which established the general rule that interest should be averaged over the full term of the loan; indeed, in the present context such a rule would prove unworkable. Plaintiffs' margin account contemplates a credit arrangement of variable interest, of indefinite duration, and fluctuating balance. If interest were to be averaged over the full term of the loan, there would be no way to determine whether an existing credit arrangement were lawful or not; that issue could not be resolved until the account were closed, and either debtor or creditor by choosing the right moment to close the account could cause the interest over the term to exceed lawful rates.

*McConnell,* at 376–77.

Although we find the remarks of the California court interesting, they are not dispositive. Since the question of whether fluctuating interest rates are lawful cannot be resolved under any circumstance until the end of the term, the concern that the lawful or unlawful nature of the rates could be determined by the date the term ended, at the option of either of the parties, seems irrelevant. Given the nature of the margin account where customers are continuously borrowing money and where the margin account is open ended, we believe the more desirable rule, in line with previous decisions in this state, is that the term over which interest must be calculated is that of the entire period of the loan.

■ Two final points remain: (1) Plaintiffs argue the computation of interest on a 360–day year violates Washington's usury law. Although the term per annum which appears in RCW 19.52.020 has not been defined by this court, it is a Latin phrase meaning "by the year". In ordinary usage, a year is considered to be 365 days except for leap year. A different usage is suggested neither by the statute nor the parties. We agree with the analysis found in *American Timber & Trading Co. v. First Nat'l Bank,* 511 F.2d 980 (9th Cir. 1973), *cert. denied,* 421 U.S. 921, 43 L. Ed. 2d 789, 95 S. Ct. 1588 (1974), where the court, with reference to an Oregon law which allows a maximum of 12

percent per annum, held the 360–day calculation produced interest at the rate of 12.167 percent per annum. While the impact of the 360–day calculation will be to raise slightly the actual interest charged, this is still immaterial unless, at the end of the term this resulted in interest for the entire term at an actual rate of more than 12 percent.

▬ (2) Plaintiffs, relying on *Blake v. Yount,* 42 Wash. 101, 84 P. 625 (1906), allege that compounding the interest on the margin account would result in interest being charged of over 12 percent per annum and, therefore, would be usurious. The confidence in *Blake* is misplaced. While the court did state, at page 105, "if the interest is to be paid so often and if not so paid compounded, and it is evident that the intention is to obtain more than the legal rate of interest, the result would be [usurious]," it went on to add that where, as here, the debtor can avoid payment of the larger sum by payment of a smaller sum—*i.e.,* paying the interest charge on a monthly basis—the larger sum· is a mere penalty and not usury. The compounding of interest on the margin account is not usurious.

We hold (1) the summary judgment of the trial court as to the applicable law is reversed; (2) the judgment of the trial court as to the method of computing interest is affirmed; (3) the case is remanded to the Superior Court to divide the certified class into subclasses which will allow proper treatment under the conflict of laws analysis contained herein.

WRIGHT, C.J., and ROSELLINI, HAMILTON, and HICKS, JJ., concur.

HOROWITZ, J. (concurring in part; dissenting in part)—The majority agrees the state of New York has a substantial relationship to the securities margin contract between the defendant stockbroker and this plaintiff, as well as similar contracts between the defendant and Washington residents. Accordingly, under Restatement (Second) Conflict of Laws § 203 (1971), relied upon by the majority as a

correct expression of the rule determining whether a usurious rate has been charged, the relationship between New York's usury law and Washington's usury law must be considered.

Prior to the American Law Institute's adoption of section 203, this court long ago adopted the rule that "the parties to a contract may make the same with reference to the laws of any state or country and have their contractual rights governed thereby, provided only that such laws have a real and not a mere fictitious connection with the subject–matter of the transaction." *Crawford v. Seattle, R. & S. Ry.*, 86 Wash. 628, 635, 150 P. 1155 (1915). Since the majority holds that the state of New York has a substantial relationship to the securities margin contract, the New York law would govern under the rule just quoted if the rate of interest charged were lawful under New York law.

Restatement (Second) Conflict of Laws § 203 (1971), however, adds a further requirement, namely, that the rate of interest permissible in the state to which the contract has a substantial relationship must be one "not greatly in excess of the rate permitted by the general usury law of the state of the otherwise applicable law under the rule of § 188" (in this case, Washington).

In explaining the rationale of section 203, section 203(b) states:

A prime objective of both choice of law . . . and of contract law is to protect the justified expectations of the parties. Subject only to rare exceptions, the parties will expect on entering a contract that the provisions of the contract will be binding upon them. . . . Usury is a field where this policy of validation is particularly apparent.

. . . Upholding a contract against the charge of usury by the application of the local law of one state, which has a substantial relationship to the transaction and the parties, can hardly affect adversely the interests of another state when the stipulated interest is only a few percentage points higher than would be permitted by the local law of the other state. Under these circumstances, the courts deem it more important to sustain the validity of a

contract, and thus to protect the expectations of the parties, than to apply the usury law of any particular state.[1]

When we look to New York law on the question of permissible rates of interest we find that the legal rate is prescribed by the banking board at not less than 5 percent nor more than 8.5 percent per annum. If no rate is prescribed it is 6 percent per annum. General Obligations Law § 5.501(1); Banking Code § 14–a; 7 Martindale–Hubbell Law Directory 1765 (1978). In the case of a securities margin contract for the purchase of stock, however, when the unpaid balance of the loan is payable on demand, a different section of the General Obligations Law applies, namely section 5–525. It provides that the applicable rate of interest may not exceed 25 percent per annum. A sharp distinction is thus made between ordinary contracts involving loans of money and securities margin contracts. For the latter, any rate *up to* a maximum of 25 percent per annum is lawful.

The question that presents itself is therefore whether the words "permissible in the state to which the contract has a substantial relationship" as contained in section 203 refer only to the maximum permissible rate even if that rate has not been charged, rather than to the actual (also permissible) rate charged to and paid by the purchaser under the securities margin contract. Neither Restatement section 203 nor the comments on that section in the Restatement deal specifically with this question.

The answer emerges however, when generally understood policy reasons, which lie at the bases of usury statutes and their interpretation are considered.

A basic reason for a limitation of interest rates we must consider is the protection of borrowers from oppression. *See* Restatement (Second) Conflict of Laws § 203 (1971);

---

[1]For a description of the theoretical justification for protecting the justified expectations of the parties to a contract, *see* H. Berman & W. Greiner, *The Nature and Functions of Law* 608–14 (3d ed. 1972) under the heading "Why Should the Law Ever Protect the Expectation Interest?"

RCW 19.52.020; *Baske v. Russell,* 67 Wn.2d 268, 273, 407 P.2d 434 (1965). No oppression occurs when a rate of interest is neither charged nor paid. Hence, the fact that a very high maximum rate of interest is permissible under New York law can hardly be grounds for claiming oppression when that rate has not in fact been charged and the rate actually charged is lawful but not oppressive. What has been said is especially true when a securities margin contract is involved. Such a contract has a particular function for a particular kind of stock purchaser. Respondent stockbroker points out that an investment of $1,000 in a margin purchase of stock, plus a loan from the stockbroker to the customer secured by the stock purchased to pay for the remaining balance of the purchase price, enables the purchaser to buy approximately $2,000 worth of stock with the resulting possibility of receiving twice the dividends and twice the profits from stock appreciation. No unavoidable urgency compels a customer to buy stock on margin. He simply seeks to obtain the benefits of what he considers to be an attractive speculation knowing the risks involved should the price of the stock go down. If the customer likes, he may avoid incurring interest charges at any time during the life of the loan by selling other securities he owns to satisfy his debit balance owing to the stockbroker, or borrowing sufficient funds from other sources to pay that debit balance. There is nothing compulsory about the customer entering into a margin contract with a choice of law provision. The customer is not in the position of one buying necessities or other consumer goods. *See Gamer v. duPont Walston, Inc.,* 65 Cal. App. 3d 280, 286, 135 Cal. Rptr. 230 (1976), upholding the validity of the interest rate charged for a loan made under a securities margin contract containing a provision that New York law governs.

Considered in this light, it is understandable that New York law makes a sharp distinction between interest chargeable on ordinary loan contracts and interest chargeable on a securities margin contract. Accordingly, if we are to compare New York's authorized interest rate with

Washington's maximum interest rate, it makes much more sense to look to the rate actually charged rather than a higher rate not charged which plays no role in the transactions entered into. In this case the effective rate of interest charged to the plaintiff, using the formula which the majority approves, was 14 percent per annum. This rate was not contrived; it came about because of an unanticipated short term rise in call money rates in New York beyond the stockbroker's control. When those rates went down, the stockbroker's interest rates to its margin account customers on their debit balances also went down. Fourteen percent per annum is not greatly in excess of 12 percent per annum, as was properly conceded by plaintiff's counsel during oral argument.

As noted in the Restatement (Second) Conflict of Laws § 203 (1971), already quoted:

> Upholding a contract against the charge of usury by the application of the local law of one state, which has a substantial relationship to the transaction and the parties, can hardly affect adversely the interests of another state when the stipulated interest is only a few percentage points higher than would be permitted by the local law of the other state.

A second basic reason to be considered is that when no unlawful rate has been charged, access to credit from out–of–state sources should be protected by upholding the validity of the rate charged. Restatement (Second) Conflict of Laws (1971) at page 650 states:

> A prime objective of both choice of law . . . and of contract law is to protect the justified expectations of the parties.

The discussion, after noting the insignificance of a few percentage points difference between the law of the state of substantial relationship and the law of the state of the otherwise governing law, also stated at page 650:

> Under these circumstances, the courts deem it more important to sustain the validity of a contract, and thus to protect the expectations of the parties, than to apply the usury law of any particular state.

When, therefore, we seek to ascertain the meaning of the words "a rate of interest that is permissible" found in section 203, in relation to the words "not greatly in excess of [the otherwise permitted rate, *i.e.,* Washington's]" the words used address themselves to the actual rate charged rather than to an uncharged maximum rate. This construction gives effect to the realities of the transaction. A customer does not complain of something that *has not* happened to him, he complains of something that *has* happened to him. In this case, New York's 25 percent maximum rate was not used. It had no effect on the plaintiff or on any Washington resident.

In sum, the majority relying on Restatement (Second) Conflict of Laws § 188(3) (1971), upholds the security margin account provision that New York law governs—that law having a substantial relationship to the contract. That law is relevant to the facts of this case in which the effective rate of interest charged was 14 percent per annum. That rate was permitted and lawful under New York law even if higher rates that might have been charged but were not in fact charged, were also permitted and lawful. Restatement (Second) Conflict of Laws § 203 (1971), which the majority adopts as Washington law, if construed to require application of New York's uncharged 25 percent per annum maximum interest rate would needlessly frustrate the justified expectation of the parties that the security margin contracts were binding—a frustration not required by the policy considerations which underlie the protection against the exaction of usury.

Accordingly, the proposed subclass in plaintiff's class suit could consist only of Washington residents who are margin account customers who have heretofore executed a security margin contract with the defendant or its predecessors for whom it is liable, the contract providing that New York law would govern, provided further, however, that the effective rate charged is more than a "few percentage points higher than would be permitted by the local law of [Washington]." Restatement (Second) Conflict of Laws § 203(b) (1971).

Except in respects noted, I concur in the majority opinion.

STAFFORD, UTTER, and BRACHTENBACH, JJ., concur with HOROWITZ, J.

Reconsideration granted January 5, 1979.