# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| AMERICAN DATA GUARD, LLC, a Delaware limited liability company, Appellant, v. NORTHWEST CENTER, INC., d/b/a AMERICAN DATA GUARD, a Washington nonprofit corporation. Respondent. | DIVISION ONE No. 78375-1-I UNPUBLISHED OPINION FILED: June 3, 2019 |

DWYER, J. — Northwest Center, Inc. (NWC) sold its shredding business, including its equipment, to American Data Guard, LLC (ADG). ADG subsequently sued NWC for breach of contract, asserting that the shredding equipment did not function consistent with industry standards and thus breached the equipment warranty term in the Asset Purchase Agreement (the Agreement). NWC successfully moved for summary judgment, seeking dismissal of ADG's claim, contending that the equipment warranty did not guarantee that the equipment would meet industry standards and that the equipment functioned as warrantied. The trial court granted NWC's motion and dismissed ADG's claim for breach of contract. On appeal, ADG asserts that a factual dispute existed as to whether the shredding equipment functioned as warrantied and that the trial court improperly dismissed its breach of contract claim. Because ADG does not establish that there is a genuine issue as to any material fact with regard to NWC's alleged breach of warranty, we affirm.

I

On December 13, 2013, NWC, a Seattle-based nonprofit organization, decided to sell its shredding business. NWC engaged Chris Howard of Waterfront Capital to assist with the sale.

Throughout 2014, Howard tried to broker a deal between NWC and various potential buyers, but all of the deals fell through. Subsequently, Howard formed ADG and negotiated his own deal to purchase the shredding business. Throughout the negotiation process, NWC repeatedly informed Howard and ADG that the value of the business stemmed from its goodwill and customers, not the aging equipment. NWC suggested that the equipment was worth at most $375,000.

When NWC presented Howard with a proposed draft of an asset purchase agreement, it provided that the equipment would be purchased "as is." Howard insisted on different language, suggesting that NWC "[a]t least rep to the assets being adequate and in good enough condition to operate the business."

Accepting Howard's proposal, the final Agreement stated:

> **3.5 Condition of the Acquired Assets.** All of the Acquired Assets that are tangible, and each item thereof, are adequate and in sufficient condition to operate the Business on an ongoing basis. Buyer understands that the shredders and certain of the trucks have normal wear and tear for their age, and that certain assets not necessary for the operation of the Business are idle as of the Closing Date. The Acquired Assets constitute all of the assets owned by Seller that are used or necessary to conduct and operate the Business as it is presently conducted and operated, and none of the Excluded Assets used in the Excluded Businesses are necessary to conduct the Business.

The Agreement also included a bilateral attorney fee provision and a

2

Delaware choice of law provision. Additionally, the financial schedules attached in section 3.11 of the Disclosure Schedule in the Agreement showed that the yearly cost of equipment maintenance for the four years preceding the sale totaled more than the value of the equipment.[1]

ADG and NWC executed the Agreement on December 31, 2014. ADG took over the business in January 2015. Initially, ADG continued to run the business in NWC's facility. ADG made repairs to the shredders and certain parts of the shredding trucks in order to keep them running. After completing the repairs and moving out of the space it had been renting from NWC, ADG decided to pursue an indemnity claim against NWC. ADG then filed a lawsuit against NWC, claiming breach of contract and alleging that the shredding equipment did not function as warrantied.

NWC moved for summary judgment seeking dismissal of ADG's claim. In support of its motion, NWC presented the deposition of Nathan Amouroux, who managed the shredding business for NWC prior to the sale and continued with ADG after the sale as ADG's general manager. Amouroux testified that "the equipment was running at a certain condition before the sale. It continued to run in the same condition after the sale."

At the hearing on NWC's motion, NWC contended that it warrantied only that the equipment would continue to function after the sale as it had before the sale, and that the equipment functioned as warrantied. NWC also contended

---

[1] NWC's yearly cost of equipment maintenance prior to the sale was $102,719 for 2014, $96,607 for 2013, $76,734 for 2012 and $90,076 for 2011.

that even if there was a breach of a contract provision, section 8.4 of the Agreement (the "anti-sandbagging" provision) specifically limited the seller's liability if the buyer had knowledge of such breach prior to the closing date, and that ADG had knowledge of the condition of the equipment. Thus, NWC contended that ADG had no basis for its breach of contract claim and that the claim should be dismissed as a matter of law. In reply, ADG asserted that there was a dispute of material fact with regard to ADG's knowledge of NWC's equipment and that NWC's "continuing operation" argument lacked evidentiary support and was irrelevant to the condition of the equipment at the time of the sale. The trial court granted NWC's motion for summary judgment. ADG appeals.

II

ADG contends that the trial court erred by granting summary judgment in favor of NWC on ADG's breach of contract claim. This is so, ADG asserts, because the equipment warranty in the Agreement unambiguously requires that the shredding equipment properly shred paper consistent with industry standards and the equipment did not perform consistent with such standards. In reply, NWC avers that the equipment warranty promises only that the equipment will continue to function after the sale as it had before the sale. NWC has the better argument.

A

We "review a summary judgment ruling de novo and consider the same evidence heard by the trial court, viewing that evidence in a light most favorable

4

to the party responding to the summary judgment [motion]." Slack v. Luke, 192 Wn. App. 909, 915, 370 P.3d 49 (2016) (citing Lybbert v. Grant County, 141 Wn.2d 29, 34, 1 P.3d 1124 (2000)). "A court may grant summary judgment if the pleadings, affidavits, and depositions establish that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Lybbert, 141 Wn.2d at 34. The facts and all reasonable inferences drawn therefrom are construed in the light most favorable to the nonmoving party. In re Estates of Jones, 170 Wn. App. 594, 603, 287 P.3d 610 (2012). "A material fact is one that affects the outcome of the litigation." Owen v. Burlington N. Santa Fe R.R., 153 Wn.2d 780, 789, 108 P.3d 1220 (2005). "While questions of fact typically are left to the trial process, they may be treated as a matter of law if 'reasonable minds could reach but one conclusion' from the facts." Slack, 192 Wn. App. at 916 (quoting Hartley v. State, 103 Wn.2d 768, 775, 698 P.2d 77 (1985)).

B

Both of the parties assert that substantive Delaware law governs the Agreement and its interpretation because the parties agreed that their contract was to be construed under Delaware law. We agree.

Washington courts generally enforce contract choice of law provisions with certain exceptions. Erwin v. Cotter Health Ctrs., Inc., 161 Wn.2d 676, 695-96, 167 P.3d 1112 (2007). Washington courts disregard the contract provision and apply Washington law when (1) without the provision, Washington law would apply, (2) the chosen state's law violates a fundamental public policy of

5

Washington, and (3) Washington's interest in the determination of the issue materially outweighs the chosen state's interest. Erwin, 161 Wn.2d at 694-95 (citing O'Brien v. Shearson Hayden Stone, Inc., 90 Wn.2d 680, 685, 586 P.2d 830, 605 P.2d 779 (1978) and quoting RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187 (1971)). Washington will enforce a choice of law provision unless all three of these conditions are met. See McKee v. AT&T Corp., 164 Wn.2d 372, 384, 191 P.3d 845 (2008) (citing Erwin, 161 Wn.2d at 695-96).

Section 10.6 of the Agreement provides that "[t]his Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without regard to its conflict of laws provisions." Although the equipment is located in Washington, Delaware is ADG's home state. This case involves a freely negotiated contract between ADG and NWC, two sophisticated companies that explicitly selected Delaware law to govern their contract. Both parties agree that Delaware law applies. There are no severe unbalanced interests in this case. Application of the contract law of Delaware will not be contrary to a fundamental policy of Washington and Washington does not have a materially greater interest in the determination of this particular issue. We therefore apply Delaware law.

C

ADG contends that the equipment warranty unambiguously requires that the equipment properly shred paper consistent with industry standards. Furthermore, during oral argument, ADG explicitly asserted that NWC warrantied that the shredding equipment would function better after the sale than it had

before the sale. In reply, NWC asserts that the equipment warranty requires that the equipment continue to function after the sale as it had before the sale. NWC's analysis is superior.

1

Delaware courts have "long upheld awards of summary judgment in contract disputes where the language at issue is clear and unambiguous." GMG Capital Invs., LLC v. Athenian Venture Partners I, LP, 36 A.3d 776, 783 (Del. 2012). "'[W]here reasonable minds could differ as to the contract's meaning,' however, 'a factual dispute results and the fact-finder must consider admissible extrinsic evidence,' making summary judgment improper." Riverbend Cmty., LLC v. Green Stone Eng'g, LLC, 55 A.3d 330, 334 (Del. 2012) (alteration in original) (quoting GMG Capital Invs., 36 A.3d at 783). Thus, the first step in the analysis requires a court to decide whether the language of a contract is ambiguous. Riverbend Cmty., 55 A.3d at 334.

When interpreting a contract, Delaware courts will give priority to the parties' intentions as reflected in the four corners of the agreement. GMG Capital Invs., 36 A.3d at 779. "'In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein.'" GMG Capital Invs., 36 A.3d at 779 (quoting E.I. du Pont de Nemours & Co. v. Shell Oil Co., 498 A.2d 1108, 1113 (Del. 1985)).

"'Delaware adheres to the "objective" theory of contracts, i.e. a contract's construction should be that which would be understood by an objective, reasonable third party.'" Estate of Osborn ex rel. Osborn v. Kemp, 991 A.2d

1153, 1159 (Del. 2010) (quoting NBC Universal v. Paxson Commc'ns, 2005 WL 1038997, at *5 (Del.Ch. 2005)). "'The true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant.'" Lorillard Tobacco Co. v. Am. Legacy Found., 903 A.2d 728, 739 (Del. 2006) (quoting Rhone–Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co., 616 A.2d 1192, 1196 (Del.1992)). "Under well-settled case law, Delaware courts look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract." Lorillard Tobacco Co., 903 A.2d at 738.

"'A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction.'" GMG Capital Invs., 36 A.3d at 780 (quoting Rhone–Poulenc Basic Chems. Co., 616 A.2d at 1195). "Rather, an ambiguity exists '[w]hen the provisions in controversy are fairly susceptible of different interpretations or may have two or more different meanings.'" GMG Capital Invs., 36 A.3d at 780 (quoting Eagle Indus., Inc. v. DeVilbiss Health Care, Inc., 702 A.2d 1228, 1232 (Del.1997)). "An unreasonable interpretation produces an absurd result or one that no reasonable person would have accepted when entering the contract." Osborn, 991 A.2d at 1160.

When a contract's meaning is plain and unambiguous, it will be given effect. Osborn, 991 A.2d at 1159-60. "[T]he parol evidence rule bars the admission of evidence from outside the contract's four corners to vary or contradict that unambiguous language." GMG Capital Invs., 36 A.3d at 783 (citing Eagle Indus., Inc., 702 A.2d at 1232).

2

We look at the plain language of the equipment warranty provision in controversy to decide whether it is fairly susceptible to different interpretations or whether it may have two or more reasonable meanings. The warranty provision states:

> **3.5 Condition of the Acquired Assets.** All of the Acquired Assets that are tangible, and each item thereof, are adequate and in sufficient condition to operate the Business on an ongoing basis. Buyer understands that the shredders and certain of the trucks have normal wear and tear for their age, and that certain assets not necessary for the operation of the Business are idle as of the Closing Date. The Acquired Assets constitute all of the assets owned by Seller that are used or necessary to conduct and operate the Business as it is presently conducted and operated, and none of the Excluded Assets used in the Excluded Businesses are necessary to conduct the Business.

ADG contends that NWC warrantied that the equipment would properly shred paper consistent with industry standards on an ongoing basis. Furthermore, ADG asserts that NWC warrantied that the shredding equipment would function better after the sale than it had before the sale. We disagree.

ADG's interpretation adds words to the original text by demanding that the shredding equipment meet industry standards. Nowhere in section 3.5 is there a promise that the equipment will operate to shred paper consistent with industry standards. Indeed, nowhere in section 3.5, nor in any other provision of the Agreement, do the words "industry standards" even appear. The warranty states only that the shredding equipment is "adequate and in sufficient condition to operate the Business on an ongoing basis."

9

Furthermore, the cost of a very limited warranty term was reflected in the low value NWC attributed to the equipment. NWC suggested that the equipment was worth at most $375,000. The financial schedules attached in section 3.11 of the Disclosure Schedule in the Agreement showed that the yearly cost of equipment maintenance for the four years preceding the sale totaled more than that claimed value. Given the value of the equipment and the disclosed yearly costs of equipment maintenance, no reasonable seller would have accepted ADG's interpretation of the warranty when entering the contract.

In contrast to ADG, NWC asserts that it warrantied only that the equipment was sufficient to continue existing operations. We agree.

We look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract. "This is because dictionaries are the customary reference source that a reasonable person in the position of a party to a contract would use to ascertain the ordinary meaning of words not defined in the contract." Lorillard Tobacco Co., 903 A.2d at 738.

The pertinent provision in the Agreement states that "[a]ll of the Acquired Assets . . . are adequate and in sufficient condition to operate the Business on an ongoing basis." "Operate" and "ongoing" are not defined in the Agreement. Thus, we look to dictionaries for assistance in determining their plain meaning.

Webster's Third New International Dictionary provides, in pertinent part, that "operate" means "to manage and put or keep in operation whether with personal effort or not < *operated* a grocery store >." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1581 (2002). Furthermore, it provides that "operation"

10

means "capacity for action or functioning" and that "ongoing" means "continuously moving forward." WEBSTER'S, supra, at 1581, 1576. Thus, we conclude that section 3.5 of the Agreement warrantied only that the equipment was adequate and in sufficient condition to perform the functions necessary for a shredding business to continuously move forward.

Review of the contract as a whole supports our reading of the warranty provision. There is no language in the Agreement warrantying that the shredding quality would be any different than it was before the sale, and no language in the Agreement warrantying that the shredding equipment would perform better or differently than it had before the sale. Section 3.5 is the only warranty provision in the Agreement referencing the condition of the shredding equipment. Following the first sentence in section 3.5, the contract provides that "[t]he Acquired Assets constitute all of the assets owned by Seller that are used or necessary to conduct and operate the Business *as it is presently conducted and operated.*" (Emphasis added.) Read as a whole, the equipment warranty provision required only that the equipment operate in the same manner before and after the sale. The warranty term is not ambiguous.

3

ADG next contends that NWC's interpretation of the warranty is simply another way of articulating a materially lesser "as is" provision, and that he specifically rejected such a provision when negotiating the purchase. We disagree.

Under Delaware law, an "as is" provision indicates that there is no warranty. 5A Del. Code 1953 § 2-316(3)(a). Delaware Code § 2-316 (3)(a) states that unless the circumstances indicate otherwise, all implied warranties are excluded by expressions like "as is," "with all faults," or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty. The warranty provision in this Agreement is distinguishable from an "as is" provision under Delaware law. NWC warrantied that the shredding equipment would operate in the same manner after the sale as it had operated before the sale. This warranty, though limited, is clearly different from the complete absence of any warranty implied by an "as is" provision. ADG is wrong in claiming that an "as is" provision was foisted upon it even after it had rejected such a limitation.

4

NWC contends that there is no genuine dispute as to any material fact with regard to whether NWC breached the equipment warranty provision. This is so, NWC asserts, because the record establishes that the equipment operated in the same manner before and after the sale. We agree.

The record is clear that the equipment continued to operate and the business continued to run in the same manner after the sale as it had prior to the sale. Amouroux, who managed the shredding business for NWC prior to the sale and continued with ADG after the sale as ADG's general manager, conceded that "the equipment was running at a certain condition before the sale. It continued to run in the same condition after the sale." ADG presented no

evidence to the contrary. Thus, there was no breach and no dispute as to any material fact.

Because there is no genuine dispute as to any material fact regarding whether NWC breached the contract, we affirm the grant of summary judgment in favor of NWC on ADG's breach of contract claim.[2]

III

NWC requests an award of attorney fees on appeal. Because ADG's contract with NWC provides for an award of attorney fees to the prevailing party, and because NWC is the prevailing party, NWC is entitled to an award of fees.

Despite the presence of a choice of law provision, the forum state usually applies its procedural law. Parrott Mech., Inc. v. Rude, 118 Wn. App. 859, 864, 78 P.3d 1026 (2003). Notably, Delaware follows this rule. Tumlinson v. Advanced Micro Devices, Inc., 106 A.3d 983, 987 (Del. 2013). Accordingly, we apply Washington procedural law to award attorney fees on appeal, even though we determine whether NWC is entitled to an award of attorney fees based on the substantive law of Delaware.

Delaware follows the American rule that "litigants are normally responsible for paying their own litigation costs. An exception to this rule is found in contract litigation that involves a fee shifting provision. In these cases, a trial judge may

---

[2] Additionally, ADG, relying on an anti-sandbagging provision in the contract, asserts that, summary judgment was improper because there is a genuine issue of material fact as to ADG's knowledge of the state of the equipment at the time the Agreement closed. By its terms, however, the anti-sandbagging provision in this Agreement applies only if there is an inaccuracy in NWC's representations or warranties as set forth in the Agreement or if NWC breaches the agreement. However, there was no breach. Furthermore, NWC's representations and warranties, as set forth in the Agreement, were accurate. Thus, the anti-sandbagging provision does not apply.

award the prevailing party all of the costs it incurred during litigation." Sternberg v. Nanticoke Mem'l Hosp., Inc., 62 A.3d 1212, 1220 (Del. 2013) (quoting Mahani v. Edix Media Grp., Inc., 935 A.2d 242, 245 (Del. 2007)). Furthermore, "the contractual prevailing-party provision continue[s] to operate and entitle[s] the [prevailing] party to recover expenses for prevailing on appeal." Marilyn Abrams Living Tr. v. Pope Invs., LLC, 188 A.3d 829, 834 (Del. Ch. 2018) (citing Council of Wilmington Condo. v. Wilmington Ave. Assocs., L.P, No. CIV.A.94C-09-004, 1999 WL 1223792, at *2 (Del. Super. Ct. Nov. 3, 1999); accord New Castle Auto Auction & Consignments, Inc. v. Riley, 2017 WL 2676966, at *2 (Del. Com. Pl. Apr. 17, 2017)).

NWC is the prevailing party. The contract provides for an award of fees. Thus, the trial court correctly awarded attorney fees to NWC. We do the same. Upon compliance with the applicable rule, a commissioner of our court will enter a suitable order.

Affirmed.

We concur:

_Mann, A.C.J._

_Dwyer, J._

_Leach, J._

14